**In re PAVILION PLACE ASSOCIATES, Debtor.**

**Bankruptcy No. 88 B 10530(TLB).**

United States Bankruptcy Court, S.D. New York.

April 11, 1988.

Ravin, Sarasohn, Cook, Baumgarten Fisch & Baim by Robert A. Baime, Jonathan I. Rabinowitz, Roseland, N.J., for debtor.

Stroock & Stroock & Lavan by Robin Keller, Eugene F. O'Connor, II, New York City, Leonard, Street & Deinard by Allen I. Saeks, Minneapolis, Minn., for Trustees of the Cent. Pension Fund of the Intern. Union of Operating Engineers and Participating Employers.

Angel & Frankel, P.C. by Bruce Frankel, New York City, for Jackson–Scott Associates.

Harold Jones, U.S. Trustee by Donna Lieberman, New York City.

## DECISION ON MOTION TO TRANSFER VENUE

TINA L. BROZMAN, Bankruptcy Judge.

The ten trustees (Trustees) of the Central Pension Fund of the International Union of Operating Engineers and Participating Employers request the transfer of the Chapter 11 case of Pavilion Place Associates (the Debtor) from the United States Bankruptcy Court for the Southern District of New York to the United States Bankruptcy Court for the District of Minnesota.[1] The Trustees allege that venue is not proper in New York under 28 U.S.C. section 1408, and alternatively, if venue is proper, the case should be transferred pursuant to 28 U.S.C. section 1412, in the interest of justice or for the convenience of the parties.

### I.

On March 11, 1988, the Debtor filed a chapter 11 petition to stave off an immi-

---

**1.** Of the ten Trustees, only one resides in Minne-  sota. The others are spread across the nation.

nent foreclosure of its property by the Trustees. The Debtor is a Connecticut limited partnership which owns, operates, and leases a shopping center known as Pavilion Place in Roseville, Minnesota (the Center). The Center is a specialty mall tenanted by high-end retailers and providers of services. It is the Debtor's sole asset. The Debtor has a registered office and agent in Minneapolis, Minnesota, and employs a local leasing agent and managing agent in connection with the Center.

The Debtor partnership consists of eight limited partners who reside in New York or the metropolitan area, and one general partner, Madison Associates, itself a partnership, which has its principal place of business in New York. Martin Berger and Neil Blumstein are the partners in Madison Associates. Each resides in New York.

The Debtor acquired the Center in September 1986. It financed the purchase through equity contributions and loans. The Debtor borrowed $13,700,000 from the Trustees and in return executed two promissory notes in the principal amounts of $9,000,000 and $4,700,000. As security for the loans, the Debtor executed two mortgages and two assignments of leases and rents in favor of the Trustees which were duly filed in Minnesota. These loans were arranged through Aldrich, Eastman & Waltch, Inc. (AEW). AEW is a Boston based investment advisor company retained by the Trustees to locate and manage investments for their funds. It functions basically as an agent for the Trustees, holding a power of attorney permitting it to make discretionary decisions on behalf of the Trustees.

At no time did the Debtor deal directly with the Trustees. AEW located the Debtor for the purpose of arranging a loan from the Trustee's pension fund, investigated the Debtor, and after an agreement was reached, negotiated all the terms of the loan with the Debtor in New York and Boston. AEW's Minnesota counsel prepared the mortgages and insured that the loan documents executed by the Debtor and AEW, on behalf of the Trustees, conformed to Minnesota law.

Although the Debtor has a managing agent, Jackson–Scott Associates (JSA), and a leasing agent at the Center, the Debtor's accountants, general counsel, bankruptcy counsel[2] and architect are located in New York or New Jersey. The architect, however, spends a substantial amount of time at the Center. All managerial decisions concerning tenants and the Center are made by Madison Associates in New York. JSA operates the Center on a daily basis conferring frequently with Mr. Berger. Mr. Berger visits the Center for two days every 60 days. He also travels to Minnesota as required to meet with prospective tenants, although he acknowledges that most tenants deal only with the leasing agent.

The only complete set of books and records for the Debtor is in New York. Included among these books and records are copies of the daily journals for the Center prepared by JSA and transmitted monthly to New York. The Debtor's in-house accountant is located in New York. Budgets and projections are preliminarily drafted by JSA and reviewed and corrected in New York. Once finalized, all of the information is transmitted to Minnesota.

The Debtor has three bank accounts, an operating account in Minnesota and two accounts in New York. Operating expenses for the Center are paid out of the Minnesota account. Other partnership expenses are paid from New York. Tenant receipts are deposited primarily into the Minnesota account. Capital improvements have generally been paid out of the New York accounts.

AEW administers the Trustees' loans from Boston. Inasmuch as the loan documentation contains a sample set of provisions which must be included in all new leases and further inasmuch as the Debtor is financially plagued, this is no small task.

---

**2.** We note that the Debtor's Minnesota counsel has just indicated to the Debtor that it may not be able to represent the Debtor during the bankruptcy case because it is representing a number of the Debtor's creditors.

Financial reports, prospective leases and the like are sent to AEW in Boston.

Nathan Foss of AEW who, together with a co-worker named Ken Lewis, is responsible for monitoring the Debtor's loans, testified that he has visited the Center quarterly to meet with JSA and the leasing agent, sometimes with the Debtor's architect, sometimes with Mr. Berger and sometimes with prospective tenants. Because of the Center's continuing financial problems, he feels it incumbent upon him to begin visiting the Center more frequently. He hopes to be able to combine to some extent his trips to the bankruptcy court with his trips to the Center.

When the Debtor purchased the Center it was 67–70% occupied and continues at about that level, although there have been some changes in the actual tenants. The "anchor" tenants, which account for some 65% of the rental income of the Debtor and 45% of the space at the Center are United Artists (which operates a multiplex theatre complex) and the International Fitness Center (IFC). Neither has Minnesota headquarters.

The Debtor is negotiating with each anchor respecting the lease of additional space, and, in the case of United Artists, respecting the funding by the tenant of additional parking for the mall. Insufficient parking has contributed to the pressures requiring the Debtor to grant rent concessions to the smaller retailers to induce their continued occupancy. United Artists is based in New York and negotiations have been conducted here. IFC's corporate parent is based in Arizona. Negotiations have been conducted in that state and in New York. The smaller retailers are local Minnesota concerns. Another of the Center's problems is its lack of a restaurant. The Debtor is negotiating with several restaurant concerns one of which is located in Minnesota.

The parties agree that full occupancy of the mall would not cure the Debtor's ills, although it would ameliorate some of the cash flow deficit. There must be one or combination of a financial restructuring of the secured debt, which Mr. Foss acknowledged and indicated AEW would on appropriate conditions entertain, a physical restructuring of the Center, entry into leases with additional anchor tenants, and an infusion of new capital. Because cash flow has been inadequate, Madison Associates has provided $300,000 to the Debtor over and above its initial capitalization. Mr. Berger testified that if he can reach an accommodation with AEW he may well be able to persuade the limited partners to provide additional funding to the Center. In addition, Mr. Berger is exploring the possibility of the Debtor's entering into a joint venture with another developer. His negotiations with Minnesota developers have been largely fruitless, but he is continuing to talk to one and is pursuing other nationally known developers located in New York, New Jersey, Indiana and Michigan.

Excluding Madison Associates and the Director of Property Taxation in St. Paul, Minnesota (whose claim has been paid by AEW), the Debtor has only 21 unsecured creditors holding an aggregate of $353,000 in claims. Of these 21 claims, three are held by national corporations all of which have offices in Minnesota and one is held by a Connecticut law firm which represented the Debtor. The Debtor's Minneapolis law and public relations firms and AEW's Minneapolis counsel, all of whom are creditors, are clearly Minneapolis-based. No evidence was adduced respecting the other 14 creditors but they all have Minnesota mailing addresses on the Debtor's petition. The public relations firm, which holds some $198,000 of the $353,000 in non-insider unsecured debt, has joined in the Trustees' motion.[3] The $13,500,000 in claimed indebtedness to the Trustees is the only se-

---

**3.** During the second day of trial, three of the unsecured creditors by affidavit joined in the Trustees' motion. Although we accept the fact that they have joined in the motion, we excluded as hearsay the substance of the affidavits.

The Debtor declined the Court's offer to hold the record open so that it could submit affidavits from creditors in support of the New York venue.

cured debt. It is the Trustees, of course, who seek to transfer venue.

## II.

■Venue for chapter 11 cases is governed by 28 U.S.C. § 1408 which provides that a case may be commenced in the district in which the debtor has its domicile, residence, principal place of business or principal assets for the 180 days immediately preceding the commencement of the case. So although the Debtor's principal asset is located in Minnesota and the case certainly could have been filed there, the principal place of business provides an independent basis of venue. The Debtor contends, and correctly we think, that its principal place of business is in New York.[4]

The burden of proof on whether venue is proper rests with the movant. The Trustees must demonstrate by a preponderance of the evidence that the case should be transferred. *In re Island Club Marina, Ltd.*, 26 B.R. 505, 507 (Bankr.N.D.Ill.1983) *In re Commonwealth Oil Refining Co., Inc.* 596 F.2d 1239, 1241 (5th Cir.1979), *cert. denied*, 444 U.S. 1045, 100 S.Ct. 732, 62 L.Ed.2d 731 (1980) (decided under the former Bankruptcy Act and Rules).

The question of what constitutes the principal place of business is one of fact. *Commonwealth Oil*, 596 F.2d at 1241. The place where the debtor "makes its major business decisions constitutes the principal place of business of a debtor, notwithstanding the physical location of its assets or production facilities." *In re Landmark Capital Co.*, 19 B.R. 342, 347 (Bankr.S.D.N.Y.1982), *aff'd sub nom. Landmark Capital Co. v. North Central Dev. Co.*, 20 B.R. 220 (S.D.N.Y.1982). The unrefuted testimony establishes that all managerial decisions are made in New York, that the daily operation of the Center is supervised from New York, that financial planning is done primarily in New York and that the only complete set of books and records is maintained in New York. Accordingly, the principal place of business is in New York and venue is undeniably prop-

er. *Cf. Landmark Capital Co., supra* 19 B.R. 342.

■ That does not, however, end the inquiry, for 28 U.S.C. § 1412 permits us to transfer venue of a properly venued case in the interest of justice or for the convenience of the parties. But, as in the determination of whether venue is proper, the burden of proof is on the Trustees to prove by a fair preponderance of the evidence that a transfer is warranted, for transfer is a cumbersome disruption of the chapter 11 process. *In re Baltimore Food Systems, Inc.*, 71 B.R. 795, 799 (Bankr.D.S.C.1986); *Landmark Capital, supra*, 19 B.R. at 344 citing *In re Valley Fair Corporation*, 16 C.B.C. 586 (Bankr.S.D.N.Y.1978). The factors to be considered when determining whether to transfer venue were set forth in *Commonwealth, supra*, 596 F.2d at 1247 and have been adopted by many courts. *See, e.g., Landmark Capital, supra*, 19 B.R. at 347; *In re International Filter Corp.*, 33 B.R. 952, 956 (Bankr.S.D.N.Y. 1983); *In re Holiday Towers, Inc.*, 18 B.R. 183, 187 (Bankr.S.D. Ohio 1982). The factors are "(1) The proximity of creditors of every kind to the Court; (2) The proximity of the bankrupt (debtor) to the Court; (3) The proximity of the witnesses necessary to the administration of the estate; (4) The location of the assets; (5) The economic administration of the estate; [and] (6) The necessity for ancillary administration if bankruptcy should result." The *Commonwealth* court concluded that the "most important consideration is whether the requested transfer would promote the economic and efficient administration of the estate." *Commonwealth* at 1247. There is no litmus test which provides an invariable solution; whether to transfer the case rests in the sound discretion of the court. *Landmark Capital, supra*, 19 B.R. at 344.

■ The only factor which supports retention of venue in this district is the location of the Debtor. The asset is in Minneapolis. AEW wants the case transferred. The non-insider unsecured creditors are

---

4. The Debtor also contends that it resides in New York. Having concluded that its principal place of business is here, we need not reach that issue.

both in number and amount overwhelmingly from Minnesota. The largest non-insider unsecured creditor, holding 56 *per cent* of the non-insider unsecured debt, wants the case transferred to Minnesota. Clearly, it would be difficult for a committee of creditors haling from Minnesota to actively participate in a New York case. The central issue in the case is certain to revolve around the value of the property, a determination of which is necessary to consideration of whether the Debtor should be permitted to· use cash collateral and whether the stay should be lifted to allow the foreclosure to continue. Valuation hearings will necessarily involve testimony from the Minneapolis vicinity. Issues of Minnesota law are not only likely to arise but already have arisen, for the Debtor has contested the perfection of the Trustees' security interest in rents, issues and profits of the Center. While we have no reason to believe that liquidation is inevitable here, the Debtor's problematical cash flow, the uneasiness of its tenants, the large vacancy rate of the Center and the Debtor's dispute with AEW respecting continuing rent abatements which contravene the loan documents all indicate that there is a real possibility that the reorganization effort could fail. If that were to happen, liquidation would be better accomplished in Minnesota. Such claims as preferences, for example, could be more easily resolved there.

Although the partnership's books and records are in New York, the budgets and projections necessary to the operation of the Center are always transmitted to Minneapolis. Transferring the venue of the bankruptcy case will in no way hamper the efforts of Madison Associates to negotiate in New York with AEW, United Artists and the limited partners. We are sympathetic to the Debtor's current lack of Minnesota counsel, but this case is not even a month old. We are confident that able counsel can be quickly retained.

Improved real estate is a peculiarly local concern often better administered by a court in the district in which it is located. *See Landmark Capital, supra,* 19 B.R. at 348; *In re Greenridge Apartments,* 13

B.R. 510, 513 (Bankr.D.Ha.1981); *In re Macon Uplands Venture,* 2 B.R. 444 (Bankr. D.Md.1980). Having chosen to purchase a shopping center in Minnesota, the Debtor knowingly subjected itself to the possibility of legal action in that state, be the action by tenants or creditors.

In virtually every single asset improved real estate partnership case which we have seen, the court has transferred the bankruptcy to the jurisdiction where the assets are located. *See, e.g., In re Nantucket Apartments Associates,* 80 B.R. 154 (E.D. Mo.1987); *In re Spicer Oaks Apartments, Ltd.,* 80 B.R. 142 (E.D.Mo.1987); *In re Pickwick Place Ltd. Partnership,* 63 B.R. 290 (Bankr.N.D.Ill.1986); *In re Eleven Oak Tower Limited Partnership,* 59 B.R. 626 (Bankr.N.D.Ill.1986); *In re Old Delmar Corp.,* 45 B.R. 883 (S.D.N.Y.1985); *Landmark Capital, supra,* 19 B.R. 342. In *Holidays Tower, Inc., supra,* 18 B.R. 183, which involved a single asset real estate corporation, the court did not transfer venue, but there, the majority in amount of creditors resided in the district in which the case was filed and the managing of the debtor's condominium units was "basically custodial," facts which clearly distinguish that case from this.

Accordingly, the motion is granted. Settle an appropriate order transferring this chapter 11 case and its file to the District of Minnesota.