## In re PORTJEFF DEVELOPMENT CORP., Debtor.

**Bankruptcy No. 089–90322–21.**

United States Bankruptcy Court, E.D. New York.

Aug. 24, 1990.

---

Anderson, Kill, Olick & Oshinsky by Mark D. Silverschotz, New York City, for debtor Portjeff.

Pinks, Brooks, Stern & Arbeit by Steven G. Pinks, Hauppauge, N.Y., for Creditors Committee.

Hogan, Evans, Baldwin, Rini, Yost & Mednick by Byron Paul Yost, New Haven, Conn., for Pepitone & Marina.

Rivkin, Radler, Bayh, Hart & Kremer by John Preefer, Uniondale, N.Y.

Cleary, Gottlieb, Steen & Hamilton by Joshua Rawson and Nancy E. Schwarzkopf, New York City, Payne, Wood & Littlejohn by Philip C. Kilian, Glen Cove, N.Y., for Norstar Bank.

Jerome T. Dorfman, Woodbury, N.Y., for Goodhue Marine.

Brown, Paindiris & Zarella by Edward N. Lerner, Fairfield, Conn., for Sentinel Bank.

U.S. Dept. of Justice by Christine Black, Office of U.S. Trustee, Garden City, N.Y.

## OPINION

CECELIA H. GOETZ, Bankruptcy Judge.

Before the Court is a motion by Norstar Bank ("Norstar"), pursuant to 28 U.S.C. § 1412 and Bankruptcy Rule 1014, for change of venue and transfer to this Court of two Chapter 11 bankruptcy proceedings currently pending in the United States Bankruptcy Court for the District of Connecticut (the "Connecticut Proceedings"): one filed by an individual, James A. Pepitone (*In re James A. Pepitone,* Case No. 5–90–00992) and the other by a corporation, Marina del Mar, Inc. ("Marina" or "Marina del Mar") (*In re Marina del Mar, Inc.,*

Case No. 5–90–00993), wholly owned by Pepitone ("Connecticut debtors"). Both were filed on May 31, 1990.

At the time the Connecticut proceedings were filed there had been pending in this Court for over a year Chapter 11 proceedings involving two entities owned and controlled by Pepitone—Portjeff Development Corporation ("Portjeff") and Hampton Bays Realty Corp. ("Hampton Bays")— making the requested relief appropriate pursuant to 28 U.S.C. § 1412 and Bankruptcy Rule 1014(b). They are two of the corporations and partnerships through which Pepitone carries on his real estate operations. Involuntary bankruptcy proceedings, subsequently converted to voluntary Chapter 11 reorganizations, were brought against Portjeff and Hampton Bays in this Court in March 1989.

28 U.S.C. § 1412 provides:

A district court may transfer a case or proceeding under Title 11 to a district court for another district, in the interest of justice *or* for the convenience of the parties. (Emphasis added).

Bankruptcy Rule 1014(b) provides, in pertinent part:

Procedure When Petitions Involving the Same Debtor or Related Debtors Are Filed in Different Courts.

If petitions commencing cases under the Code are filed in different districts by or against ...

(4) *a debtor and an affiliate*, on motion filed in the district in which the first petition is filed and after hearing on notice to the petitioners and other entities as directed by the court, the court may determine, in the interest of justice *or* for the convenience of the parties, the district or districts in which the case or cases should proceed. Except as otherwise ordered by the court in the district in which the first petition is filed, the proceedings on the other petitions shall be stayed by the courts in which they have been filed until the determination is made. (Emphasis added).

The two Connecticut debtors, Pepitone and Marina, are each "affiliates" of the Eastern District debtor, Portjeff (and of Hampton Bays as well), as those terms are defined by the Code. Section 101(2) of the Code defines affiliate, in part, as:

(A) *entity that directly or indirectly owns, controls, or holds with power to vote, 20 percent or more of the outstanding voting securities of the debtor,* ...

(B) corporation 20 percent or more of whose outstanding voting securities are directly or indirectly owned, controlled, or held with power to vote, by the debtor, *or by an entity that directly or indirectly owns, controls, or holds with power to vote, 20 percent or more of the outstanding voting securities of the debtor* ... (Emphasis added).

Section 101(14) of the Code defines "entity" as including, among other things, a "person."

Applying Section 101(2)(A) of the Code to the facts here involved, Pepitone, who owns and controls 100 percent of the stock of Portjeff (and 80 percent of the stock of Hampton Bays), is an affiliate of Portjeff, the debtor herein (and of Hampton Bays as well). Similarly, applying Section 101(2)(B) of the Code, Marina, 100 percent of whose stock is owned and controlled by Pepitone, who owns 100 percent of the stock of Portjeff, is an affiliate of Portjeff (and Hampton Bays) because they have a common parent. Both Pepitone and Marina are affiliates of each other.

The movant Norstar is a New York bank with its principal place of business at Melville, New York. According to a proof of claim filed with this Court, dated July 21, 1989, for $8,761,713, Norstar is the senior and largest secured creditor of Portjeff. Portjeff, in its schedules, acknowledges a claim of Norstar in the amount of $2,597,-391. Norstar is also a creditor of Pepitone and Marina, albeit its claim against Marina is disputed, as is its largest claim against Pepitone. Pepitone's Chapter 11 petition admits owing Norstar $40,000 making Norstar one of its twenty largest creditors.

Norstar's motion with respect to the venue of Marina's Chapter 11 proceeding is

supported by The Greater New York Savings Bank which holds a mortgage in the amount of $4,800,000 on Marina's real property, by Goodhue Marine, Inc., a creditor of Marina, and by the Creditors' Committees of Portjeff and Hampton Bays; it is opposed by Pepitone, and the two corporations he controls, both now debtors-in-possession, Portjeff and Marina. It is not opposed by any creditor of Marina.

With respect to Pepitone, Norstar's motion is supported by the same entities that wish a change in the venue of Marina's Chapter 11 and by Rivkin, Radler, Bayh, Hart & Kremer ("Rivkin, Radler"), former attorneys for Pepitone and a joint defendant with Pepitone and Marina in the RICO action, described hereinafter, now pending in the Eastern District of New York; it is opposed by Pepitone, Portjeff, Marina and two creditors of Pepitone, the Connecticut National Bank which is listed in Pepitone's petition as owed $550,000, and Sentinel Bank, a Connecticut bank, listed as owed $150,000. These banks take no position on the venue of Marina's Chapter 11 proceeding.

Bankruptcy Rule 1014(b) specifically provides that a motion to transfer a proceeding to a venue where a proceeding for a related debtor is pending is to be brought "in the district in which the first petition was filed." Such a motion is a core proceeding "concerning the administration of the estate" (28 U.S.C. § 157(b)(2)(A)) which may be heard by the bankruptcy court pursuant to the district court's order of reference under 28 U.S.C. § 157(a). *In re Texaco Inc.*, 89 B.R. 382, 387 (Bankr.S.D.N.Y. 1988); *In re Ofia Realty Corp.*, 74 B.R. 574, 576 (Bankr.S.D.N.Y.1987); *In re Waits*, 70 B.R. 591, 594 (Bankr.S.D.N.Y.

1987); *In re Toxic Control Technologies, Inc.*, 84 B.R. 140, 142 (Bankr.N.D.Ind. 1988). Therefore, this Court is empowered to determine this venue motion.

A relatively quick decision is imperative because decisions have to be made in the two Chapter 11 proceedings now pending in the Connecticut court and until this motion is decided, it is uncertain what court has authority to act.[1]

Originally, the two Connecticut debtors, Pepitone and Marina, contended that no decision should be reached until they had had an opportunity for discovery as a preliminary to an evidentiary hearing. After the Court indicated that it saw no need for the requested discovery, Pepitone and Marina agreed to have the Court decide the motion on the basis of affidavit proof and the representations of counsel and to waive certain alleged procedural defects in the moving papers. They stated that they were doing so based upon three rulings from by Court:

(1) Norstar has a claim, (2) the Court felt comfortable relying on Bankruptcy Rule 9011 to insure accuracy in Norstar's papers, and (3) the Court did not need to consider the validity of Norstar's highly disputed civil Rico claims.[2]

(Objection to Norstar's Motion for change of Venue and Transfer of Cases to the Eastern District of New York, July 30, 1990 (hereinafter "Connecticut Debtors' Objection), p. 2).

The Sentinel Bank in opposing Norstar's motion had said that it "questions the validity of Norstar's claim" and "suggest[ed] that a careful evidentiary examination be undertaken prior to the court's consideration of Norstar's claim that it is accredit-

---

1. As this Court reads Bankruptcy Rule 1014(b) all proceedings in the Connecticut court are stayed, but the attorney for the Connecticut debtors took the position in this Court that the Rule is not self-executing and so, despite the pendency of the motion to change venue, nothing stays the proceedings from continuing in Connecticut.

2. Norstar recapitulates the Court's rulings more fully. They were (1) that Norstar is a creditor of both Connecticut debtors and has standing to make its motion; (2) that in reliance on Bank-

ruptcy Rule 9011 the Court would deem the "Transfer Memo" (Motion for Change of Venue and Transfer of Cases to the Eastern District of New York), submitted in support of the motion and signed by counsel to be the equivalent of an attorney's affidavit; and (3) it is not necessary to the decision of the present motion to determine the merits of the fraud and "Racketeer Influenced and Corrupt Organizations Act" ("RICO") claims that have been asserted by Norstar in the Eastern District of New York.

ed." (Objection to Motion to Change Venue and Transfer Proceedings to the Eastern District of New York, July 24, 1990, p. 2). It was this examination that the Court held to be unnecessary. What the Court said was: "I'm not going into the question as to whether there is a bona fide RICO claim. There is a RICO lawsuit pending, and that's enough for the time being. I am not going into the merits of that claim." (Transcript of Hearing, July 25, 1990, p. 67). The Court later repeated: "We will treat as irrelevant the merits of the RICO claim, except that the RICO [action] exists and there is ongoing litigation before Judge Platt in this Court." (Tr., July 25, 1990, p. 98).

## THE FACTS

Portjeff is in the business of constructing and developing a condominium project known as "Fox Meadow," in Port Jefferson Station in the Eastern District of New York. Hampton Bays is in the business of constructing and developing a condominium project known as "Fox Hill" in Ossining, New York. Marina del Mar is in the business of operating and developing a marina in Seaford, Town of Hempstead, New York. Both the Fox Meadow project and the property of Marina del Mar are located within the Eastern District of New York.

Marina, Portjeff and Hampton Bays are all owned and controlled by James A. Pepitone, now a resident of Connecticut. He has other business interests and assets but the record contains only fragmentary information as to them and as to their value. Other corporate vehicles employed by Pepitone of which the record discloses almost nothing but their names are J.A.P. Realty Co., James Pepitone Company, James A. Pepitone Realty Corp. and Empire State Construction Corporation. James A. Pepitone Realty Corp. is identified on an Amended Condominium Offering Plan for Fox Meadow, the Portjeff project, as the selling agent for the project and its address is given as 724 Boston Post Road, Madison, Connecticut. (Connecticut Debtors' Objection, Ex. D)

Apart from a four acre parcel of property in North Madison, Connecticut, of unknown value, all Pepitone's known assets consist of various corporate and partnership interests. In addition to his stock interests in Marina, Hampton Bays and Portjeff, Pepitone has an 8.2 percent interest in a partnership that owns an office building complex in Garden City, New York, and a 50 percent interest in a partnership which owns a shopping center in North Madison, Connecticut. (Response to Reply Memorandum to Objection to Norstar's Motion For Change of Venue and Transfer of Cases to the Eastern District of New York, filed by the Connecticut Debtors, August 3, 1990 (hereinafter "Connecticut Debtors' Response"), Ex. G). Pepitone does not own the house in which he lives in Connecticut, that is the property of his wife. (Notice of Motion to Change Venue and Transfer Proceedings to the Eastern District of New York Pursuant to Bankruptcy Rule 1014(b), June 29, 1990, hereinafter "Transfer Memo", Ex. B).

Up until mid–1987 all Pepitone-owned corporations (including Portjeff, Hampton Bays and Marina del Mar) had their billing and accounting offices at 146 Birch Hill Road, Locust Valley, New York, 11560. (Connecticut Debtors' Objection, p. 12). That year these functions were moved to a trailer located on the property of Marina del Mar where the day-to-day records of these corporations are still being maintained. (Ibid.) All the accounting work for the corporations was under the supervision of Laurence Amaturo.

Since 1987 bank accounts for Portjeff have listed the marina office at Marine Park Drive as Portjeff's address (Transfer Memo, Ex. I). Tradesmen and materialmen supplying Portjeff were directed to send invoices and bills to the Marine Park Drive address. (Transfer Memo, Exs. J & K; Reply Memorandum in Support of Norstar's Motion for Change of Venue and Transfer of Cases, August 2, 1990 (hereinafter "Norstar's Reply Memo 2"), Ex. P).

Bills rendered Portjeff in 1986, 1987 and 1988 were paid by checks drawn on the accounts of Empire State Construction Cor-

poration, a Pepitone owned company, James Pepitone Co. and James Pepitone Realty and the recipients were told to apply those moneys to debts owed by Portjeff or Hampton Bays. (Norstar's Reply Memo 2, Ex. P).

The corporations engaged in multiple intercorporate transfers among themselves and with Pepitone. Checks issued from corporation to corporation were recorded as loans. (Connecticut Debtors' Objection, p. 10).

In the year preceding Portjeff's bankruptcy, Portjeff transferred $826,700 to J.A.P. Realty; $44,100 to James Pepitone Company and $30,000 to Marina del Mar. (Petition in Support of Norstar's Motion for Change of Venue, filed by Creditors' Committee, July 24, 1990 (hereinafter "Creditors' Committee Memo"), p. 3). Hampton Bays transferred $93,000 to Marina, $84,000 to James Pepitone Company, $97,970 to J.P. Realty, $183,550 to Hampton Bays, $31,000 to Empire Ventures and $224,500 to Portjeff. (Creditors' Committee Memo, p. 4).

Beginning 1987 Portjeff drew checks payable to Marina in the amounts of $435,000, $75,000 and $113,000. (Transfer Memo, Ex. L).

According to Pepitone's attorneys, Pepitone lent over $2 million in 1988 to Portjeff which allegedly exceeded any amounts paid out by Portjeff to Pepitone entities, including amounts paid as loans to James A. Pepitone and payments made by Portjeff on account of sums due and owing for services performed by James A. Pepitone Realty Corp. (Connecticut Debtors' Objection, pp. 10–11).

Portjeff purchased its property in Port Jefferson in 1985. To finance construction, Portjeff borrowed $14 million from Norstar. That year and in 1987 Pepitone gave Norstar unconditional guarantees that Portjeff would complete and pay for the work being financed. (Reply to Pepitone and Marina del Mar's Preliminary Objection to Norstar Bank's Motion For Change of Venue and Transfer of Cases, July 24, 1990 (hereinafter "Norstar's Reply Memo 1"), Ex. N). Norstar loans were secured by mortgages on the Port Jefferson Station property and are documented by notes. (Transfer Memo, Ex. E).

Marina's property in Seaford, in the Eastern District of New York, was bought by Pepitone in 1984 with the aid of a loan from Greater New York Savings Bank, located in the Town of Hempstead in the Eastern District of New York, on which loan there is now owed $4,790,000. Greater New York Savings Bank has a first lien on the Marina property. (Connecticut Debtors' Objection, Ex. E).

The first of Pepitone corporations to be plunged into bankruptcy was Portjeff. On March 16, 1989 an involuntary petition was filed against that company by suppliers and materialmen. The proceeding was converted to Chapter 11 on April 17, 1989. According to Portjeff's schedules its liabilities exceed its assets by nearly $4 million. Among its liabilities is a loan payable to its sole stockholder in the amount of $2,018,710. (Transfer Memo, Ex. H). No plan of reorganization has yet been proposed in the Portjeff proceeding.

On March 27, 1989, an involuntary petition was filed against Hampton Bays, thereafter converted to Chapter 11 on April 17, 1989.

In December 1989 Norstar brought an action in the District Court for the Eastern District of New York against Pepitone, Laurence Amaturo, Marina and Rivkin, Radler. (Transfer Memo, Ex. F). The complaint alleges a fraudulent scheme between June 1987 and February 1989 pursuant to which $2,920,571 in closing proceeds due Norstar under its loan agreements with Portjeff were misappropriated and used to pay off debts of other Pepitone entities, including Marina del Mar, and of Pepitone. The complaint claims that Pepitone violated the Racketeer Influenced and Corrupt Organization Act, committed fraud and conversion. It asks that a constructive trust be declared as to certain funds in Pepitone's possession. It alleges that Pepitone was the alter ego of Portjeff. Norstar is requesting damages for fraud and treble damages for a pattern of racketeering activity as defined in 18 U.S.C. § 1962 *et seq.*

On January 24, 1990, Chief District Court Judge Thomas C. Platt ordered the attachment of all property held by or for the benefit of Pepitone in New York to secure a potential judgment against him in the amount of $2,970,511 in favor of Norstar. (Transfer Memo, Ex. G).

The order for attachment, as Marina del Mar subsequently explained to the Connecticut Bankruptcy Court, precipitated the filing under Chapter 11 on May 31, 1990 by both Pepitone and Marina. On that date both filed skeletal petitions for relief under Chapter 11 in the Bankruptcy Court for the District of Connecticut. (Transfer Memo, Exs. B, C). By filing under Chapter 11 Pepitone and Marina automatically stayed under 11 U.S.C. § 362 the ongoing litigation before Chief Judge Platt and stopped execution of the order of attachment. The debtors subsequently explained to the Connecticut Court as follows their reasons for filing:

### HISTORY LEADING TO THE FILING

The Marina Del Mar, Inc. (hereinafter "the Marina") Chapter 11 filing is related to a Chapter 11 filing by James A. Pepitone, Case No. 5–90–00992.... The Marina filing and Mr. Pepitone's personal filing were precipitated by the following events in an unrelated project.

In 1985, Portjeff Development Corp. purchased an approved condominium site in Port Jefferson Station, New York. Norstar Bank financed the 133 unit project.... By January 1989, 130 of the 133 units were in contract at a total price of Twenty Million ($20,000,000) Dollars and construction had been completed on 133 unites. The project at that point should have produced millions in profits....

Mr. Pepitone had moved from New York to Connecticut in 1987. The daily control of construction and accounting cash flow had been turned over to well-paid, trusted employees supervised by his controller, Mr. Lawrence Amaturo.

Late in December, 1988, Mr. Pepitone was informed by his controller, Mr. Amaturo, that some kind of problem existed at an unrelated development project, Hampton Bays ... [I]n January, 1989, he [Mr. Amaturo] prepared and presented a compilation which indicated expenditures beyond what was previously reported to Mr. Pepitone ..., and he was unable to explain the variance. Mr. Amaturo was unable to explain how expected profits had turned into losses in a matter of several weeks.

\* \* \* \* \* \*

At the end of January, 1989, Mr. Pepitone hired an independent auditor from Connecticut, David Leigh, C.P.A., of Bailey, Moore, Glazer, Schaefer & Proto, who has expertise in construction accounting. Mr. Leigh spent a couple of days reviewing the books and records and informed Mr. Pepitone that there was indeed millions of dollars in expected profits that had not materialized and additionally, that closing proceeds in Port Jefferson Development Corp. had in some 22 closings not been remitted to the Bank.... Upon discovery of this situation, Mr. Pepitone called Mr. Matson, Executive Vice–President of Greater NY Savings Bank, and Mr. Jack Bransfield, President of Norstar Bank, and asked to have an emergency meeting with them both that afternoon ... The next day, all corporate checking accounts at Norstar Bank were frozen, including accounts of other independently incorporated projects which had no relationship to Port Jeff Development Corp. Additionally, One Hundred Thousand ($100,000) Dollars was moved from the Marina's account to the Port Jeff Development account by Norstar. Further, Norstar refused to continue closing Port Jeff units even though there were valid contracts with mortgage commitments and homeowners begging to close. Hundreds of thousands of dollars were lost by that action.

Immediately thereafter, sub-contractors filed an involuntary Chapter 7 on both the Port Jeff project and an unrelated project, Hampton Bays Corp., at which they were doing work.... While Mr. Pepitone has just reached an agreement

in principle on a plan of reorganization in the Hampton Bays Corp. Chapter 11, the Port Jeff Corp. case has become mired in litigation and intimidation being pursued by Norstar.

During the course of negotiations in 1989, Greater NY put pressure on Mr. Pepitone, because of their participation in the Port Jeff loan, and stated that they could not consider extending the loan on the Marina until a full settlement was made with Norstar on the Port Jeff Development. Other banks were contracted and indicated that they would consider a new first mortgage on the Marina but also indicated that Norstar would have to be cleared up first.

Norstar Bank filed a civil RICO action against Mr. Pepitone and the Marina a couple of days before Christmas, 1989. They obtained an attachment of Mr. Pepitene's [sic] New York assets based upon Mr. Pepitone's residing outside New York and engaged in other tactics designed to pressure Mr. Pepitone into paying out his personal assets to cover the shortfall in Norstar's unguaranteed loan.... The civil RICO action, *Norstar vs. James A. Pepitone et al.* [742 F.Supp. 1209 (E.D.N.Y.1990)] is currently pending before District Judge Platt in the Eastern District of New York (the "Norstar Action"). The proceedings to date in the Norstar Action involve the filing of the Complaint and the issuance of an order of attachment against Mr. Pepitone based on the fact that he is not a New York domiciliary.

\*   \*   \*   \*   \*   \*

The purpose of this Chapter 11 is to put the Marina's and Mr. Pepitone's assets squarely in the jurisdiction of this Court in plain and open view to all and to re-acquire the flexibility, subject to this Court's approval, to deal with those assets in a manner intended to protect the Marina and Mr. Pepitone's legitimate direct creditors.

(Connecticut Debtors' Objection, Ex. E)

The Chapter 11 petitions filed by Pepitone and Marina are naked petitions almost devoid of any detail. Full schedules, so far

as this Court knows, have never been filed. Pepitone's petition provides no information respecting his assets and no information respecting his liabilities except the names of his creditors and the amounts owed the largest. It contains no declaration that he intends to file a plan pursuant to Chapter 11; no check mark appears in the box signifying such intention. He states his address to be 114 Middle Beach Road, Madison, Connecticut. (Transfer Memo, Ex. A).

Pepitone includes Norstar among his nineteen largest creditors but acknowledges it to be a creditor only to the extent of $40,000. Of the remaining eighteen unsecured creditors listed by Pepitone as his largest, twelve (representing $1,083,-150.33 in liquidated claims and three unliquidated claims for legal fees), are located in New York, six in the Eastern District; only four creditors (representing $700,990.31 in liquidated claims and one unliquidated claim for legal fees) are located in Connecticut. Of all his creditors, only 28 in number if the tax authorities are excluded, nine are located in Connecticut, 16 are in New York, including five located in the Eastern District.

The Marina petition identifies Marina del Mar's mailing address as "Drawer 4037—North Madison Shopping Center, Madison, Connecticut, 06443." Marina says it intends to file a Chapter 11 plan. (Transfer Memo, Ex. C).

Marina's petition claims total assets of a value of $10 million as against total liabilities of $7,100,000, from which it says there is excluded "Spurious RICO claim by Norstar Bank of $8,900,000." Two secured debts are listed, one for $4,800,000 (the amount owed Greater New York Savings Bank), the other for $2,000,000, presumably the money Pepitone claims Marina owes him.

Goodhue Marine, which has a lien on the floating dock belonging to Marina, is listed as a general creditor, not as a secured creditor. Of the 20 general creditors listed as the largest (in which Marina does not include Norstar), 14 (representing $143,-142.51 or 82 percent of the unsecured

claims) are located in New York, and 12 of these are in the Eastern District of New York. Only two creditors with claims of $9,067.28 are located in Connecticut. Of all the named creditors, excluding the tax or other governmental authorities, eleven are in the Eastern District, six are in Connecticut.

Shortly after the Chapter 11 petitions were filed Marina applied to use cash collateral. Then, according to counsel for Pepitone and Marina, "Judge Schiff instructed counsel for Greater New York, the secured party (and a 50% participant in the Norstar loan to Portjeff), to support its opposition to Mr. Pepitone's salary from the Marina by obtaining an appraisal on the Marina and submitting same in time for the final hearing on cash collateral. Greater New York decided it was preferable to withdraw its opposition." (Connecticut Debtors' Objection, p. 16).

## DISCUSSION

As this Court has previously ruled, Norstar has standing to make the present motion. Norstar is acknowledged to be a creditor of both Pepitone and Portjeff and has a claim, albeit disputed, against Marina. Indeed, the large debt owed Norstar by Portjeff might alone give it standing. *Cf., In re FRG, Inc.*, 107 B.R. 461 (Bankr. S.D.N.Y.1989). In any event its standing to request the transfer of the two Connecticut proceedings is rendered academic by the joinder in its request by other creditors of both Marina and Pepitone.

28 U.S.C. § 1412 and Bankruptcy Rule 1014 authorize the transfer of cases from one district to another either in the "interest of justice" or "for the convenience of the parties." These phrases each give authority independent of the other. *In re Toxic Control Technologies, Inc.*, 84 B.R. 140, 143 (Bankr.N.D.Ind.1988). Formerly both requirements had to be met. The transfer had to be both in the interest of justice *and* for the convenience of the par-

ties.[3] It is true that generally what serves the convenience of the parties will also serve the interest of justice, but the contrary is not necessarily true.

These principles have been recognized by the Federal courts in construing the similar language found in 28 U.S.C. § 1404(a) authorizing transfers "for the convenience of parties and witnesses, in the interest of justice."

The "interest of justice" is a separate component of a § 1404(a) transfer analysis, *Van Dusen* [*v. Barrack*], 376 U.S. [612] at 625, 84 S.Ct. [805] at 813–14 [11 L.Ed.2d 945] (1964); *Internatio–Rotterdam, Inc. v. Thomsen*, 218 F.2d 514 (4th Cir.1955), and may be determinative in a particular case, even if the convenience of the parties and witnesses might call for a different result. *See, e.g., Lemke v. St. Margaret Hospital*, 594 F.Supp. 25 (N.D.Ill.1983); *Blanning v. Tisch*, 378 F.Supp. 1058 (E.D.Pa.1974); *see also* 15 C. Wright & A. Miller, Federal Practice and Procedure, § 3854 (1986); *cf. Continental Grain Co. v. The FBL–585*, 364 U.S. 19, 26, 80 S.Ct. 1470, 1474, 4 L.Ed.2d 1540 (1960). Factors traditionally considered in an "interest of justice" analysis relate to the efficient administration of the court system.

*Coffey v. Van Dorn Iron Works*, 796 F.2d 217, 220–21 (7th Cir.1986):

An authoritative text reads:

Although, as Judge Friendly has pointed out, "the letter of the section might suggest otherwise," it is well established that the interest of justice is a factor to be considered on its own and an important one, and that the interest of justice may be decisive in ruling on a transfer motion even though the convenience of the parties and witnesses point in a different direction.

15 Wright, Miller & Cooper, Federal Practice and Procedure: Jurisdiction, § 3854, pp. 279–280 (1976), quoting from *New York*

---

**3.** "Or" was substituted for "and" when 28 U.S.C. § 1412 replaced 28 U.S.C. § 1475 as part of the 1984 Amendments. Bankruptcy Amendments and Federal Judgeship Act of 1984, July 10, 1984. 28 U.S.C. § 1475 provided: "A bankrupt-

cy court may transfer a case under title 11 or a proceeding arising under or related to such a case to a bankruptcy court for another district, in the interest of justice *and* for the convenience of the parties." (Emphasis added).

*Central Railroad Co. v. United States,* 200 F.Supp. 944, 946–47 (D.C.N.Y.1961).

■ Avoiding conflicting decisions and a situation in which two cases involving precisely the same issues are simultaneously pending in two different courts serves the interest of justice. That goal finds reflection in Subsection (b) of Bankruptcy Rule 1014 by giving the court in the district in which a proceeding involving related debtors is first filed the authority to determine whether any proceedings should be allowed to continue in a different district and staying all proceedings elsewhere until the original court has had the opportunity to consider what the interest of justice or the convenience of the parties requires.

The parties have assumed that the burden of proof lies on Norstar as the party seeking a change in the venue of the Connecticut proceedings. Accepting that assumption, the Court is satisfied that the burden has been met both with respect to Marina del Mar and Pepitone. From all the facts available both the "interest of justice" and the "convenience of parties" will be best served by transferring venue of the two Connecticut Chapter 11 proceedings to this Court.

■ Over time a laundry list of commonly accepted criteria for determining the convenience of parties has been developed. The ones most commonly mentioned—but not the only ones the courts have named as pertinent—are:

(1) the proximity of creditors of every kind to the Court;

(2) the proximity of the bankrupt (debtor) to the Court;

(3) the proximity of witnesses necessary for the administration of the estate;

(4) the location of the assets;

(5) the economic administration of the estate; and

(6) the necessity for ancillary administration if [liquidation] should result.

*In re Commonwealth Oil Refining Co., Inc.,* 596 F.2d 1239, 1247 (5th Cir.1979), *cert. denied,* 444 U.S. 1045, 100 S.Ct. 732, 62 L.Ed.2d 731 (1980) (interpreting former Bankruptcy Rule 116, the predecessor of Bankruptcy Rule 1014(a), 1983 Advisory Committee Note); *In re Hadar Leasing International Co., Inc.,* 14 B.R. 819, 820 (S.D.N.Y.1981); *In re Landmark Capital Co.,* 19 B.R. 342, 347–40 (Bankr.S.D.N.Y. 1982), *aff'd sub nom. Landmark Capital Co. v. North Central Development Co.,* 20 B.R. 220 (S.D.N.Y.1982); *In re Developers of Caguas, Inc.,* 26 B.R. 977, 980 (Bankr.E. D.N.Y.1983); *In re Dock of the Bay, Inc.,* 24 B.R. 811, 815–16 (Bankr.E.D.N.Y.1982); *In re Pavilion Place Assoc.,* 88 B.R. 32, 35 (Bankr.S.D.N.Y.1988); *In re Texaco Inc.,* 89 B.R. 382, 387 (Bankr.S.D.N.Y.1988); *In re Greenhaven Assoc., Ltd.,* 93 B.R. 35 (Bankr.S.D.N.Y.1988); *In re FRG, Inc., supra* at 471; *In re Slentz,* 94 B.R. 446, 450 (Bankr.N.D.Ohio 1988).

These criteria were developed prior to the creation of the U.S. Trustee's office and as significant as any of the *Commonwealth* criteria should be the burden created for that office.

Furthermore, many courts, including the Southern District of New York, have named as a significant consideration which bears directly on the interests of justice, "whether the intertwined relationship of debtors requires proceedings in one district." *In re Hadar Leasing International Co., Inc.,* 14 B.R. at 820; *In re Slentz,* 94 B.R. at 450; *In re Ryan,* 38 B.R. 917, 921 (Bankr.N.D.Ill.1984). Also relied on is a state's interest in having local controversies decided within its borders. *In re Toxic Control Technologies, Inc.,* 84 B.R. at 143; *In re Thomasson,* 60 B.R. 629 (Bankr.M.D. Tenn.1986); *In re Boca Raton Sanctuary Assoc.,* 105 B.R. 273, 275 (Bankr.E.D.Pa. 1989).

### *The Marina del Mar Chapter 11 Proceeding*

■ From the facts which appear on the face of Marina's petition, even if no proceeding involving a related debtor were pending in this District, the parties affected would be entitled to have venue transferred to this District under Bankruptcy Rule 1014. The factor which "overwhelmingly militates in favor of transfer" is that Marina's principal, if not sole, asset is a

parcel of real property located in the Eastern District. *In re Hadar Leasing International Co.*, 14 B.R. 819; *In re Old Delmar Corp.*, 45 B.R. 883, 884 (S.D.N.Y. 1985); *In re Landmark Capital Co.*, 20 B.R. at 224; *In re Developers of Caguas, Inc.*, 26 B.R. at 980; *In re Dock of the Bay, Inc.*, 24 B.R. at 815–16; *In re Greenhaven Assoc., supra* at 40; *In re Pavilion Place Assoc.*, 88 B.R. at 36 and cases cited there. "In the interests of economical and efficient administration .... venue should remain close to the site of the debtor's principal asset." *In re Toxic Control Technologies, Inc.*, 84 B.R. at 143; *In re Oklahoma City Assoc.*, 98 B.R. 194, 199 (Bankr.E.D.Pa.1989); *In re Slentz*, 94 B.R. at 450; *In re Eleven Oak Tower Ltd. Partnership*, 59 B.R. 626, 630 (Bank.N.D.Ill. 1986); *In re 19101 Corp.*, 74 B.R. 34, 35–36 (Bankr.D.R.I.1987).

The case should be transferred even if all the other factors which the courts have recognized as pertinent to venue did not also support placing venue in the Eastern District rather than in Connecticut.

Marina's largest secured creditor, Greater New York, is located in the Town of Hempstead, New York, which is in the Eastern District; out of the 19 unsecured creditors listed in Marina's petition, 14 are located in New York and 12 of these in the Eastern District: only two creditors are located in Connecticut.

Although Marina claims its principal place of business to have been in the District of Connecticut for the six months preceding the filing of its petition and gives as its mailing address "Drawer 4037—North Madison Shopping Center, Madison, Connecticut 06443 New Haven," its only business is the operation of a marina within the Eastern District. Marina's application to use cash collateral underlines the local nature of its operations. Its income is local from its shop and store, gas dock, snack bar and so are its expenses for parts, for maintenance, rubbish removal, utilities, et cetera. The books and records as to the day-to-day activities of Marina del Mar are in the Eastern District.

What witnesses can be anticipated at the present time will be real estate appraisers familiar with property in the Eastern District, and such appraisers will almost necessarily be local persons. One reason why where a debtor's assets consist of a single piece of real estate, venue is deemed most convenient where the property is located is that the value of such property is central to every aspect of a reorganization proceeding and the witnesses that will have to be called with respect to such value will almost necessarily be from the district where the property is located. Value is critical to questions of adequate protection, to the feasibility of a plan of reorganization, to determine whether creditors realize as much from reorganization as they would from liquidation, et cetera. If the Marina Chapter 11 proceeding is permitted to remain in Connecticut, every creditor interested in Marina's reorganization will be put to the expense of hiring a local appraiser and transporting such appraiser to Connecticut or will be forced to forgo litigating that issue, exactly the choice faced by Greater New York with respect to the issue of the use of cash collateral.

In the case of Marina there is no need to discuss the factor of the interrelationship of its affairs with those of Portjeff and Hampton Bays because it is so clear that, in view of the fact that Marina's main, if not sole, asset is the real property located in this District, venue lies here, not in Connecticut.

### The Pepitone Chapter 11 Proceeding

■ Turning to Pepitone, the Court reaches the same conclusion that his Chapter 11 case should be transferred from Connecticut to this Court but does so for quite different reasons from those on which its decision as to Marina del Mar rests. Even if no proceeding involving a related debtor were pending in this District venue of Marina del Mar's Chapter 11 petition belongs in this district and a motion to transfer made under Subsection (a) of Rule 1014 would have to be granted. The same is not true with Pepitone's Chapter 11 petition. If this were a motion under Subsection (a) of Rule 1014, not under Subsection

(b), if there were no proceeding involving a related debtor pending in this Court and if there were no ongoing litigation involving his affairs so that the only relevant consideration was the convenience of the known parties to Pepitone's Chapter 11 proceeding, then there would be no warrant for interfering with Pepitone's choice of venue, based on the incomplete information available to the Court.

Looking to the *Commonwealth* factors, other than economic administration, some favor Connecticut, some the Eastern District of New York. There is no reason to doubt Pepitone's claim that he resides in Connecticut, although it is uncontrovertible that he has substantial business interests within the Eastern District. He also owns some property in Connecticut and conducts some business there.

Of the 18 creditors listed in his petition, 12 (representing $1,083,150.33 and three unliquidated claims for legal fees) are located in New York, six in the Eastern District and only four are located in Connecticut, but of these four, two are among Pepitone's largest and both oppose the transfer. There is reason, however, to question the accuracy of his petition. Norstar is scheduled as being owed only $40,000, although it has sued Pepitone for over $2 million; Goodhue Marine which says it is a creditor, is not listed anywhere.

Pepitone's assets remain a mystery. The Connecticut National Bank asserts that with the "possible exception of Pepitone's intangible assets, such as various corporate and partnership interests [the bulk of them] are located in Connecticut." Not only does the Bank provide no supporting detail but the exception swallows up the whole, since the bulk of Pepitone's assets consist of "various corporate and partnership interests." His only other known asset is a four acre parcel of property in North Madison, Connecticut, of unknown value. He does not own the house in which he lives in Connecticut, that is the property

of his wife.[4] Whether any of his assets equal or exceed the value of his equity in Marina del Mar which he places at $3 million he has elected not to disclose.

But whatever might be the result if Pepitone's Chapter 11 petition stood alone, the pendency of the other Chapter 11 proceedings cannot be disregarded in evaluating both the convenience of the parties, including the economic administration of the estate, and the interest of justice.

Economic administration and the interest of justice must take into account the proceedings already pending in this District (Portjeff and Hampton Bays) and of the proceeding being transferred here today (Marina del Mar). So viewed, it is self-evident that in the interest of efficient administration and to limit the burden on both the parties and the Office of the United States Trustee and the courts, Pepitone's Chapter 11 proceeding belongs in the same district and should be administered by the same court as the Chapter 11 proceedings of his corporate vehicles, Hampton Bays, Portjeff and Marina del Mar.

The affairs of Pepitone, Marina del Mar, Hampton Bays and Portjeff are so intertwined, their bankruptcy proceedings involve so many common and overlapping issues that splitting these cases between two courts is not in the interest of economic administration.

Pepitone claims to be a creditor of Hampton Bays and Marina del Mar. Marina del Mar, he claims, owes him $2 million; and Hampton Bays, he claims, owes him $3 million. Money has sloshed back and forth among him and his various corporate vehicles, a fact which is not changed by the careful accounts Pepitone's attorneys maintain were kept of these transfers. In the years preceding the bankruptcy of Portjeff he received substantial sums from that company. His attorney admits he received nearly $2 million. The assets of Pepitone and their source are therefore a matter of interest to the creditors of Portjeff, Mari-

---

**4.** In addition to his stock interest in Marina del Mar, Hampton Bays and Portjeff he has an 8.2 percent interest in the partnership that owns an office building complex in Garden City, New York and a 50 percent interest in a partnership which owns a shopping center in North Madison, Connecticut.

na, and Hampton Bays as well as to the creditors of Pepitone. If Pepitone is not owed the money he claims, then the creditors of each of his corporate vehicles stand to benefit. Contrariwise, it is Pepitone's creditors who will benefit if he is, in fact, owed the money he claims. This means that at issue in all four cases is what is owed Pepitone, or owed by him, and why.

Not only are Pepitone's liabilities and assets an issue common to his petition and those of Portjeff, Hampton Bays and Marina, but to the extent that the assets of any of these three debtors may prove inadequate to satisfy their creditors some, or all, of those creditors may become creditors of Pepitone. There are a variety of legal theories under which the assets of a sole stockholder may become subject to the debts of his wholly owned corporation, some of which have already been alluded to by the Portjeff and Hampton Bays Creditors Committees in support of Norstar's motion, as well as by Norstar. The Creditors Committees of Portjeff and Hampton Bays have indicated that they may try to reach Pepitone's assets under New York's Business Corporation Law and under New York's Lien Law. Norstar claims that Pepitone is Portjeff's alter ego which if proved would entitle Portjeff's creditors to pierce the corporate veil.

Therefore, respecting the proximity of creditors consideration should be given not only to the creditors Pepitone has elected to list in his schedules but to the contingent and disputed creditors he has omitted, like Norstar, and to potential creditors like Portjeff and Hampton Bays' unpaid suppliers.

The opinion of Pepitone's Connecticut lawyers that the Portjeff and Hampton Bays Chapter 11 proceedings are wholly over is more sanguine than the facts warrant. It is possible that a consensual plan may be imminent in Hampton Bays, but as to Portjeff the sale of such physical assets it still possesses will in no way terminate the Chapter 11 proceeding but it is only a way point in what is clearly going to be a complex, fiercely disputed case. As Pepitone's lawyers advised the Connecticut

court, Portjeff's reorganization proceeding is mired down in the ongoing dispute between itself and Norstar. Apart from Norstar, Portjeff's creditors are actively engaging in discovery to find out where Portjeff's money went.

Two courts should not be occupied in supervising discovery with respect to Pepitone's assets, in ruling on the issues incidental to discovery, like an accountant's claim to privilege, earlier raised in the Portjeff proceeding and in trying issues of alter ego. A New York court can deal more easily than a Connecticut court with questions under New York's Business Corporation Law and New York's Lien Law.

Since the books and records of Pepitone and his various corporate vehicles were, and are maintained, by the same employees and were supervised by the same man, Amaturo, the creditors of all these related debtors will want to review those books and records and examine and perhaps call the same witnesses. The books, the records and the witnesses are in the Eastern District.

Moreover, accountants will have to be retained by the creditors of Pepitone and the Pepitone corporations to review those books and records. It would be incompatible with economic administration to multiply the number of accountants required to review these books and records and the number of places they will be working.

Unless the venue of the Connecticut proceedings is changed, the creditors will not be alone in being burdened with duplicate proceedings. Two U.S. Trustees will have the burden of monitoring these two related proceedings. Two judge's time will be taken with many of the same issues.

Duplicate proceedings can never be consistent with economic administration. Venue is kept close to the site of a debtor's principal asset in the interest of the economical and efficient administration of a case. *In re Toxic Control Technologies, Inc.*, 84 B.R. at 144; *In re Pavilion Place Assoc.*, 88 B.R. at 36; *In re Slentz*, 94 B.R. at 450; *In re Oklahoma City Assoc.*, 98 B.R. at 199. But location of a debtor's principal asset is not the only factor which

affects economical and efficient administration. Where the affairs of several debtors are interrelated, as is the case here, economical and efficient administration similarly dictates that all the proceedings be supervised by one United States Trustee and be centered in one bankruptcy court.

Quite apart from the convenience of the parties, Pepitone's Chapter 11 proceeding should be transferred in the interest of justice. As was earlier developed, the "interest of justice" and the "convenience of the parties" are separate tests.

It is not in the "interest of justice" to tolerate or encourage forum shopping. Pepitone's Chapter 11 proceeding and that of Marina del Mar were admittedly filed to defeat the attachment earlier ordered by District Judge Platt in the adversary proceeding pending in this District. The Connecticut debtors do not simply admit that fact; they take pride in it. The purpose of their Chapter 11's, they say, was to put their "assets squarely in the jurisdiction of this [the Connecticut] court." In other words, it was to take their assets out of the jurisdiction of the Eastern District where, for the protection of Norstar, Judge Platt has put them. The reason for using Chapter 11 to undo the attachment ordered by Judge Platt was, they say, because they wanted "to deal with those assets in a manner intended to protect [their] legitimate direct creditors." But it is not up to Pepitone and Marina to determine who their "legitimate" creditors are, that is the function of the courts. The two Connecticut Chapter 11 proceedings acted to prevent, or at least impede, the courts in discharging that function.

The inference that the two Connecticut Chapter 11 proceedings were filed for reason other than the debtors' need for relief under the bankruptcy laws is reinforced by the fact that Marina del Mar is a very solvent company according to its petition and Pepitone may be likewise. Furthermore there is lacking from the skeleton petition filed by Pepitone any declaration that he intends to file a plan of reorganization. The omission might be deemed an oversight were less sophisticated attorneys involved, attorneys who in the petition filed simultaneously on behalf of Marina del Mar included such a declaration. While anyone, solvent or not, is free to file under Chapter 11, a petition filed when there is no need or intention to reorganize, is an abuse of the jurisdiction of the Court. In far less egregious circumstances where a Chapter 11 filing was made simply to escape a RICO lawsuit a Chapter 11 petition has been dismissed as lacking in good faith. *Furness v. Lilienfield*, 35 B.R. 1006 (D.C. Md.1983).

For the foregoing reasons, Norstar's motion is granted. An Order consistent with this Opinion has previously been issued.