**In the Matter of MACATAWA HOSPITALITY, INC., a/k/a Pointe West Resort, Debtor.**

**Bankruptcy No. 93–46808–S.**

United States Bankruptcy Court, E.D. Michigan, S.D.

Sept. 3, 1993.

T.N. Ziedas, Office of the U.S. Trustee, Detroit, MI.

Timothy Fusco, Gary H. Cunningham, Southfield, MI, for debtor.

### REVISED OPINION GRANTING U.S. TRUSTEE'S MOTION FOR CHANGE OF VENUE

WALTER SHAPERO, Bankruptcy Judge.

Debtor is a Michigan corporation. Its primary, if not sole, assets consist of realty and personalty comprising a hotel, restaurant and adjoining facilities operated as a resort complex, located in or near Holland, Michigan on or close to the shore of Lake Michigan ("Property"), in the Western District of Michigan. Debtor commenced this Chapter 11 proceeding on or about June 17, 1993 in the Eastern District of Michigan. Debtor's president and fifty (50%) percent shareholder, and its managing officer is Rod Sabourin ("Sabourin") who resides in the Eastern District, as does the other fifty (50%) percent shareholder who is not active in the management of the debtor. The executive management of the Property has been effected through a written five (5) year contract between the debtor and a separate corporate management entity in which Sabourin is the sole shareholder and principal officer, the office of which is also located in the Eastern District. That management entity is apparently also the vehicle through which Sabourin manages at least one (1) other facility, the same apparently being a restaurant in the Lansing, Michigan area.

The initially filed schedules in this case reveal the following creditors:

#### (a) Secured

| Name and Listed Location | Amount of Claim | Nature of Claim |
| --- | --- | --- |
| Kelwin Corporation Grand Rapids, MI | $ 450,000.00 (disputed) | Second Mortgage |
| Old Kent Bank, S.W. Grand Rapids, MI | 1,700,000.00 (disputed) | First Mortgage |
| Holland Michigan Board of Public Works | 13,867.00 | water and sewer charges |

(listed by the debtor as unsecured debt, but claimed by the creditor to be secured)

#### (b) Priority

| Name | Amount of Claim | Nature of Claim |
| --- | --- | --- |
| Internal Revenue Service | $110,000.00 (disputed) | Not evident |
| Ottawa County Treasurer | 30,000.00 (disputed) | |

(Apparently unpaid realty and personal property taxes, the amounts of which may have increased to $70,000.00 as of the present time as a result of post petition accruals.)

| State of Michigan | 47,007.00 (disputed) | Not evident |
| --- | --- | --- |

**(c) Unsecured**

Two hundred ninety-six thousand three hundred fifty-four ($296,354.00) Dollars is listed as total unsecured debt owing to approximately thirty-four (34) creditors, one of which is the management entity to which is owed approximately $165,000.00 for management fees.  Some twenty (20) to twenty-five (25) of these unsecured creditors collectively are located in the Western District and owed approximately $110,000.00;  many being owed relatively small amounts of money.  The remainder of the creditors (many of them small as well) are either located outside the State of Michigan or in the Eastern District of Michigan.

**(d) Other**

| Name | Amount of Claim | Nature of Claim |
|------|-----------------|-----------------|
| Max Depree | $ 80,000.00 | * |

* Apparently this creditor is the vendor on a land contract in which the debtor is a vendee;  the schedules refer to a land contract with this creditor as an executory contract and refer to pending litigation in a state court in the Western District relative to this interest.

---

As to the debtor's property or assets, aside from the referred to realty (valued in the schedules at $4,000,000.00), there are listed two (2) bank accounts in financial institutions in the Western District, security deposits in relation to rooms or functions at the Property, a pontoon boat, fixtures and furnishings (valued at some $320,000.00), restaurant, food and liquor inventory and a liquor license.

Further relevant evidence, adduced at the § 341 examination of Sabourin testifying on behalf of the debtor, indicates:

(a) the filing was precipitated by the maturation of a mortgage note balloon payment and debtor's inability to refinance or sell the property as of that due date;

(b) the Kelwin Corporation indebtedness is apparently not only secured by a second mortgage apparently on the same assets that secure the debt of Old Kent Bank, but a first mortgage on other assets which appear to be or may be used as part of the resort complex, but which may or may not be owned in whole or in part by this particular debtor;

(c) the tangible business records are, to the extent necessary, physically shipped (and/or the relevant data electronically transferred) from the Property to the management company offices in the Eastern District where they are utilized to pay creditors and/or expenses, prepare analyses and reports, tax returns and other documents and papers and then are returned to or retained at the Property for more permanent storage;

(d) the extensive personal property used in the Property is apparently leased to debtor under a written lease in which the lessor is a limited partnership, the general partner of which is a corporation in which Sabourin is the president; the identities of the owner of the stock of the general partner, or the limited partnership interest(s) in that lessor are not in evidence;

(e) pre-petition and possibly on-going post-petition efforts to either sell the Property or to raise money for possible refinancing have included soliciting the sale of rights and/or interests of one kind or another in the Property, or parts of it, to various third parties; as well as the listing of the Property with a local (to the Property) broker;  and

(f) there are approximately seventy-five (75) to ninety (90) full and part-time employees on site at the Property and a very small number of employees at the management company offices; there seems to be some question about whether or not those employed individuals on site at the Property are technically employees of the management company or employees of the debtor; Sabourin in his § 341 examination indicated that they were employees of the management company;  his counsel in-

dicated that may not be so; the correct answer is not decisive.

The United States Trustee has filed a motion to transfer the venue of this case to the Western District of Michigan which primarily sits in Grand Rapids which is some one hundred thirty-seven (137) miles or so from Detroit which is the seat of the Eastern District. Grand Rapids is some twenty (20) or thirty (30) miles from the Property. The U.S. Trustee argues that:

(a) the debtor's "principal place of business" is not in the Eastern District where the case was started, but rather is in the Western District and therefore venue is improper under 28 U.S.C. § 1408, and/or

(b) the Court in its discretion, in any event, should transfer the venue of this case to the Western District under Fed.R.Bankr.P. 1014(a)(1) in the interest of justice and/or for the convenience of the parties.

Old Kent Bank, the Internal Revenue Service, Kelwin Corporation, the City of Holland Board of Public Works and certain unsecured creditors have joined in, and support, the U.S. Trustee's motion.

■ The Court has concluded that it need not conclusively decide whether or not the case was initially filed in the proper district, i.e.: whether or not the Eastern District is the situs of the principal place of business of this debtor, because the Court concludes that under Fed.R.Bankr.P. 1014(a) this case, in any event, should be transferred to the Western District in the interest of justice and for the convenience of the parties.

■ The criteria to be applied in such cases are set forth in the case of *In re Greenhaven Associates, Ltd.*, 93 B.R. 35 (Bankr.S.D.N.Y.1988) where at page 40, the court said:

In exercising its discretional determination of whether or not to grant a motion to transfer venue, the court must consider the following factors:

(1) The proximity to the court of:

(a) creditors

(b) debtors

(c) assets

(d) witnesses

(2) The relative economic harm to the debtors and creditors caused by the transfer.

(3) The economics of administering the case.

(4) The effect on the parties and their willingness or ability to participate in the case or in adversary proceedings.

(5) The availability of compulsory process and the costs associated with the attendance of unwilling witnesses.

Given the diffuseness of those criteria, their necessary interrelationship, and differing views as to the weight to be accorded them, there appear to be irreconcilable and varying results in cases where the property of a debtor is located in one district or state is overseen by executives or owners who reside in another district or state. In this case it is fair to say that the crucial assets are clearly located in the Western District; almost all the operational employees are located in the Western District; most of the creditors whether secured or unsecured, large or small, are primarily located in or based in the Western District. Given the potential types of proceedings that may be involved in a case such as this, the location of the Property and the location of the creditors as indicated, it is likely that either the majority of witnesses who may be involved in the case or any court proceedings or adversary proceedings, or expert or other witnesses, may come from or be located in the Western District or give testimony in relation to facts or occurrences which arose or have their focus or situs in the Western District.

■ The debtor emphasizes the residence of the shareholders and principals of the debtor in the Eastern District and the location of the office of the managing agent and the consequent location of financial records in the Eastern District to support its view that it is their proximity to the Eastern District of Michigan which should weigh more heavily in the Court's conclusion than the other mentioned factors.

This Court disagrees. Given the advent of the electronic age including the payment and generation of payroll through an independent service or entity and the ability of management to obtain various reports and data (sometimes at the touch of a key on a computer or a telephone or a facsimile machine) indeed a good case can be made, as one creditor stated, that the "principal office" of this debtor is located in the Western District because in reality it is located in the head (and the Court would add the briefcase and automobile) of Sabourin, at the times when at least weekly either he and/or his accountant(s) or possibly one or another management employees might make physical visits to the Property in the Western District. This case differs from the situation where there are a number of plants, facilities or locations with a central "headquarters" performing a variety of important and crucial management functions involving or necessitating the centralization and/or coordination of local policies and activities, be they financial, sales, marketing, purchasing, accounting, research, etc., with the consequent economies of scale and aspects of day to day oversight and control necessary to a viable and ongoing enterprise. The "nerve center" concept referred to in cases where location of the "principal office" is in dispute (and if the Court were to decide this matter on that issue) must be evaluated by looking at the reality of situations such as these, namely, that everything of material substance occurs at the Property, except certain financial and accounting activities incident to accounting for monies, payment of creditors and preparation of reports etc. required by law, which by and large constitute the tools utilized in making certain managerial, but rarely day to day, decisions relative to the businesses' ongoing operation. The latter, while obviously necessary and important in any business, can be performed particularly in a case such as this almost anywhere, by the debtor itself, or by contracting for such with third parties, or a combination of the two. The "nerve center" here is really Sabourin who must use the fruits of that process to make the kinds of decisions he does make. This Court believes the place where those tools are prepared or produced is of relatively little importance, where, as here we are dealing essentially with one executive or policy making individual who, largely either for his own convenience or because he believed it feasible, chose to live and work in the Eastern District and operate, by and large remotely, but to him satisfactorily, in respect to the Property. It is important to note here that the debtor is *not* Sabourin.

To be sure the administration of a case such as this involves, initially at least, the negotiation by principal(s) of the debtor with secured parties and/or third parties relative to refinancing or possibly as might occur in this case the sale of the Property, preparation of a plan and disclosure statement, negotiation of such a plan and disclosure statement with creditors and/or committees of creditors or dealing with them or their representatives in a way that will lead to a successful plan, if that is possible. If that were the determining factor, the Court might conclude differently than it has. Possible also are various kinds of proceedings in the bankruptcy case and adversary proceedings in relation to claims of various creditors, the possible sale of the Property under, or in lieu of, or pursuant to some sort of liquidating plan or under § 363 of the Code, and/or proceedings to lift the stays and to convert the case to a Chapter 7 proceeding, etc., and/or various proceedings by claiming secured property relative to their interests or positions. The Court should look at all of the possibilities in evaluating the factors relating to the relative economic harm to the debtors and creditors caused by retention or transfer as well as the economics of administering the case and the effect on the parties and their willingness or ability to participate in the case or in adversary proceedings and the availability of compulsory process and the costs associated with the attendance of unwilling witnesses. That is, the Court should consider the possibility of what might be involved in a successful Chapter 11 (liquidating or otherwise), as well as what might be involved in an unsuccessful Chapter 11 and the extent to which each

might involve material or substantial negotiations and/or court proceedings of various types and kinds and the parties potentially involved. In this Court's view the locus of the development, negotiation and preparation of a plan and disclosure statement and the negotiation of same with major creditors and/or discussions relating to the possible sale to a third party, will have little practical relationship to whether this case is administered in the Eastern or Western District. In light of the foregoing, this Court tends to agree with those cases which place particular importance on, and given relatively greater weight to, the location of the single, primary real estate asset, in determining appropriate venue. *See, e.g. In re Old Delmar Corp.*, 45 B.R. 883 (Bankr.D.N.Y.1985).

■ It is, of course, possible that the costs to the debtor, to the extent the debtor decides to continue retention of Detroit counsel (and if the situs of discussions and/or negotiations is elsewhere), might be increased if venue is transferred. Whatever that incremental cost, it amounts to lesser relative harm than requiring creditors to come to Detroit in the Eastern District for the purpose of participating in the case or any adversary proceedings that might have to be brought in connection with their interests. Given the size and nature of the creditor body and the obvious relationship between what they are owed and the cost effectiveness of their actively participating in court proceedings in connection with this reorganization and the potential kinds of proceedings that are or can be involved in cases such as this, it is apparent to this Court that there is relatively greater harm to the creditor body in permitting the case to be administered in the Eastern District of Michigan than in the Western District[1]. That the geographical distance is not very great, cuts both ways, but more in favor of the creditors then the debtor. It is likely that administration of this case in the Eastern District of Michigan will reduce or chill participation of material creditors in the proceeding for reasons that have to do with the economics and feasibility of such participation either individually, directly or through the hiring of counsel, and a requirement that they travel to Detroit for the purpose of such participation. Furthermore, it is the debtor which wishes to reorganize and it is the debtor on balance which should, given the situation, be more amenable to going to the Western District to meet with creditors if necessary (than to ignore them because the distance and costs of participation lessen their opposition to what the debtor might propose). The debtor is better able and should be required to do so, and by the very nature of its chosen method of operation the debtor committed itself in the first instance to whatever cost differential might be involved in the fact it chooses to have its property located in the Western District managed from the Eastern District.

Therefore this Court concludes that the interests of justice and the convenience of parties whose interests this Court believes ought to be considered paramount in this situation are such that the case should be transferred to the Bankruptcy Court for the Western District of Michigan and in connection therewith the moving party has sustained his burden of proof in respect thereto.

The Court is simultaneously entering a previously submitted agreed as to form order effectuating this result.

---

1. As to the factor of availability of subpoenas or compulsory process, given the distance between Grand Rapids and Detroit and the one hundred (100) mile rule of Fed.R.Civ.P. 45, it is quite possible that in some instances compulsory process issuing out of the Eastern District of Michigan would not be available.