**In re LAGUARDIA ASSOCIATES, L.P., Debtor,**

**In re Field Hotel Associates, L.P., Debtor.**

**Nos. 04–34512 SR, 04–34514 SR.**

United States Bankruptcy Court, E.D. Pennsylvania.

Nov. 18, 2004.

dent as enunciated in *Clark,* 711 F.2d at 23, and *Velis,* 949 F.2d at 81–82.

Martin J. Weis, Dilworth Paxon LLP, Philadelphia, PA, for debtor.

George M. Conway, Esquire, United States Trustee, Philadelphia, PA, for trustee.

## OPINION

STEPHEN RASLAVICH, Bankruptcy Judge.

### *Introduction.*

The above two Chapter 11 cases were filed in this district on October 29, 2004. They are being jointly administered pursuant to an Order of this Court dated November 2, 2004. On November 1, 2004 there was filed in each case a Motion entitled *Motion of Suntrust Bank, as Successor Indenture Trustee and Brickman Airport Receivable Holdings LLC to Transfer Venue of Cases to Eastern District of New York.* The venue transfer motion is supported by some interested

parties but opposed by the Debtor and other interested parties. A combined evidentiary hearing on the motions was held on November 10, 2004. For the reasons set forth herein, the Motion will be denied.

**Background.**

As background, the Court incorporates the largely identical stipulated facts and exhibits offered by the parties in each case at the outset of the November 10, 2004 hearing, as follows:

*I. Field Hotel Associates:*

1. On October 29,2004 (the "Petition Date"), Field Hotel Associates, L.P. ("FHA") filed a Voluntary Petition for relief under Chapter 11 of Title 11 of the United States Code, 11 U.S.C. §§ 101 et seq.

2. Exhibit J –1 is a true and correct copy of the Petition filed by FHA.

3. Exhibit J–2 is a true and correct copy of the Creditors Matrix filed by FHA with its Petition.

5. FHA is a New York limited partnership.

6. FHA's general partner is Field Kennedy, Inc. ("FKI"), a New York corporation.

7. Martin Field is the President and sole director of FKI.

8. FHA's principal asset is its interest in the (the "Holiday Inn FHA"), a twelve story, full service hospitality facility situated in the northeast quadrant of the intersection formed by the Van Wyck Expressway and the Southern Belt Parkway, approximately two miles from John F. Kennedy International Airport in Queens County, New York.

9. The Holiday Inn FHA and the land on which it is located (the "FHA Real Estate") is owned by the New York City Industrial Development Agency ("NYCI-DA"), a governmental agency and public benefit corporation of the City and State of New York with offices in New York City, New York.

10. FHA leases the Holiday Inn FHA from the NYCIDA pursuant to the terms of a written Lease Agreement dated as of September 1, 1998 between FHA (as "Lessee") and NYCIDA ("FHA Lease").

11. The FHA Lease was made in connection with certain tax exempt bond-financing provided to FHA through NYCIDA's issue of $37,250,000 of Industrial Development Revenue Refunding Bonds (the "FHA Bonds") authorized, issued, executed, and delivered under that certain Indenture of Trust (the "FHA Indenture"), dated September 1, 1998, between NYCIDA and the United States Trust Company ("USTC"), as original Indenture Trustee for the bondholders (the "Bondholders") purchasing the FHA Bonds.

12. Movant Indenture Trustee, is successor Indenture Trustee to Bank of New York and USTC for the FHA Bondholders under the FHA Indenture.

13. As security for payment of the FHA Bonds, the Indenture Trustee holds a mortgage upon the interests of the NYCIDA and FHA in the FHA Real Estate, Holiday Inn FHA and FHA Lease as set forth in a certain Agency Mortgage and Security Agreement, dated September 1, 1998, recorded in the Office of the Queens County Clerk on October 22, 1998 in reel 5010, page 2042 (the "FHA Agency Mortgage").

14. FHA also guaranteed the repayment of FHA Bonds as set forth in a certain Guaranty and Security Agreement between FHA and USTC dated as of September 1, 1998 (the "FHA Guaranty Agreement"), now held by the Indenture Trustee as successor to USTC.

15. Exhibit J–3 is a true and correct copy of the FHA Lease.

16. Exhibit J–4 is a true and correct copy of the FHA Agency Mortgage.

17. Exhibit J–5 is a true and correct copy of the FHA Guaranty Agreement.

18. The New York City Economic Development Corporation holds a "PILOT" (payment in lieu of taxes) mortgage on the FHA Real Estate, Holiday Inn FHA and FHA Lease.

19. *In re: Prussia Associates*, a Pennsylvania Limited Partnership, under Case No. 04–11042, is pending in the United States Bankruptcy Court for the Eastern District of Pennsylvania.

## II. LaGuardia Associates, LP

1. On October 29,2004 (the "Petition Date"), LaGuardia Associates, L.P. ("LGA") filed a Voluntary Petition for relief under Chapter 11 of Title 11 of the United States Code, 11 U.S.C. §§ 101 *et seq.*

2. Exhibit J–6 is a true and correct copy of the Petition filed by LGA.

3. Exhibit J–2 is a true and correct copy of the Creditors Matrix filed by LGA with its Petition.

5. LGA is a New York limited partnership.

6. LGA's general partner is LaGuardia, Inc., a New York corporation.

7. Martin Field is the President and sole director of LaGuardia, Inc.

8. LGA's principal asset is its interest in the Crowne Plaza Hotel (the "Crowne Plaza LGA"), a 358–room hotel in East Elmhurst, Queens County, New York, near the LaGuardia International Airport in New York City, New York.

9. The Crowne Plaza LGA and the land on which it is located (the "LGA Real Estate") is owned by the New York City Industrial Development Agency ("NYCIDA"), a governmental agency and public benefit corporation of the City and State of New York with offices in New York City, New York.

10. LGA leases the Crowne Plaza LGA from the NYCIDA pursuant to the terms of a written Lease Agreement dated as of September 1, 1998 between LGA (as "Lessee") and NYCIDA the ("LGA Lease").

11. The LGA Lease was made in connection with certain tax exempt bond-financing provided to LGA through NYCIDA's issue of $50,000,000 of Industrial Development Revenue Refunding Bonds (the "LGA Bonds") authorized, issued, executed, and delivered under that certain Indenture of Trust (the "LGA Indenture"), dated September 1, 1998, between NYCIDA and the United States Trust Company ("USTC"), as original Indenture Trustee for the bondholders (the "LGA Bondholders") purchasing the LGA Bonds.

12. Movant Indenture Trustee, is successor Indenture Trustee to Bank of New York and USTC for the LGA Bondholders under the LGA Indenture.

13. As security for payment of the LGA Bonds, the Indenture Trustee holds a mortgage upon the interests of the NYCIDA and LGA in the LGA Real Estate, Crowne Plaza LGA and LGA Lease as set forth in a certain Agency Mortgage and Security Agreement, dated September 1, 1998, recorded in the Office of the Queens County Clerk on October 22, 1998, in Reel 5008, Page 2402 (the "LGA Agency Mortgage").

14. LGA also guaranteed the repayment of LGA Bonds as set forth in a certain Guaranty and Security Agreement between LGA and USTC dated as of September 1, 1998 (the "LGA Guaranty

Agreement"), now held by the Indenture Trustee as successor to USTC.

15. Exhibit J–8 is a true and correct copy of the LGA Lease.

16. Exhibit J–9 is a true and correct copy of the LGA Agency Mortgage.

17. Exhibit J–10 is a true and correct copy of the LGA Guaranty Agreement.

18. The New York City Economic Development Corporation holds a "PILOT" (payment in lieu of taxes) mortgage on the LGA Real Estate, Holiday Inn LGA and LGA Lease.

19. *In re:* Prussia Associates, a Pennsylvania Limited Partnership, under Case No. 04–11042, is pending in the United States Bankruptcy Court for the Eastern District of Pennsylvania.

**Discussion.**

With the exception of the above agreed facts, the positions of the Debtors and the Movants are sharply at odds. They disagree, in the first instance, over whether venue exists at all in this district. Assuming that it does, they further disagree over whether the case should be transferred to the Eastern District of New York in the interest of justice or for the convenience of the parties. As resolution of the former issue could moot the latter, the Court will first address the question of whether venue for these cases properly lies in this District.

Venue for bankruptcy cases is governed by 28 U.S.C. § 1408, which provides:

28 USC § 1408. **Venue of cases under title 11.**

Except as provided in section 1410 of this title, a case under title 11 may be commenced in the district court for the district—

(1) in which the domicile, residence, principal place of business in the United States, or principal assets in the United States, of the person or entity that is the subject of such case have been located for the one hundred and eighty days immediately preceding such commencement, or for a longer portion of such one-hundred-and eighty-day period than the domicile, residence, or principal place of business, in the United States, or principal assets in the United States, of such person were located in any other district; or

(2) in which there is pending a case under title 11 concerning such person's affiliate, general partner, or partnership.

■ Consideration of the residence or domicile of the present debtors is unhelpful. Indeed, the place where a partnership was formed is viewed as being of scant significance for venue purposes, because "it is difficult to see how a partnership can be said to have a residence or domicile." *In re Peachtree Lane Associates, Ltd.,* 150 F.3d 788, 792 (7th Cir.1998). Rather, "the only meaningful venue test with respect to a partnership may be the district in which it [Debtor] has its principal place of business or its principal assets in the United States." *In re Oklahoma City Associates,* 98 B.R. 194, 197 (Bankr.E.D.Pa.1989) *citing* 1 *Collier on Bankruptcy* ¶ 3.02[1][c][ii] at 3–118 (15th ed.1988).

■■ The Court thus quickly moves to the alternative tests for venue. In this dispute, it is obvious that each Debtor's principal asset—which is a hotel—is located in New York City. However, section 1408 is written in the disjunctive. Congress recognized that the principal place of a debtor's business may be distinct from the location of the debtor's principal assets. *See In re Commonwealth Oil Ref. Co., Inc.,* 596 F.2d 1239, 1244–45 (5th Cir. 1979) (hereinafter *"CORCO"*), *cert. denied,* 444 U.S. 1045, 100 S.Ct. 732, 62 L.Ed.2d 731 (1980). Thus, venue in a district distinct from the location of a partnership-

debtor's principal assets is also appropriate so long as that other district is the location of the partnership's "principal place of business." *In re Midland Associates,* 121 B.R. 459, 460 (Bankr.E.D.Pa. 1990); *In re Oklahoma City Associates,* 98 B.R. 194, 197–98 (Bankr.E.D.Pa.1989).

 Even where venue is proper, a court may nevertheless transfer a case in the interest of justice or for convenience of the parties. 28 U.S.C. § 1412; Fed. R. Bankr.P. 1014(a)(1). As the Debtor correctly observes, however, transfer of venue of a bankruptcy case should not be undertaken lightly. *In re Condor Exploration, LLC,* 294 B.R. 370, 377 (Bankr.D.Colo. 2003); *In re Enron Corp.,* 274 B.R. 327, 342 (Bankr.S.D.N.Y.2002). Thus, where venue is proper, the Debtor's choice of venue should be given great weight. *In re B.L. of Miami, Inc.,* 294 B.R. 325, 328 (Bankr.D.Nev.2003). The burden of persuasion on this point falls upon the movants. See e.g. *Midland,* 121 B.R. at 460; *Oklahoma City,* 98 B.R. at 197; *In re Pavilion Place Associates,* 88 B.R. 32, 35 (Bankr.S.D.N.Y.1988); *In re Butcher,* 46 B.R. 109, 112 (Bankr.N.D.Ga.1985); *In re Pubco Corp.,* 27 B.R. 139, 141 (Bankr. E.D.Pa.1983). Certain courts have gone even further, opining that the balance must "strongly" favor transfer, *In re Uslar,* 131 B.R. 22, 23 (Bankr.E.D.Pa.1991), or that the evidence must demonstrate clear and proper justification. *In re Holiday Towers, Inc.,* 18 B.R. 183, 187 (Bankr. S.D.Ohio.1982).

28 U.S.C. § 1412 provides in full:

A district court may transfer a case or proceeding under title 11 to a district court for another district, in the interest of justice or for the convenience of the parties.

 It has been observed that § 1412 is also written in the disjunctive, making transfer of venue appropriate *either* in the interest of justice *or* for the convenience of the parties, and that this statutory provision creates two distinct analytical bases upon which transfer of venue may be grounded. *In re Pinehaven Associates,* 132 B.R. 982, 989–90 (Bankr.E.D.N.Y. 1991).

As to the first basis, one court has noted that the

'interest of justice' component of § 1412 is a broad and flexible standard which must be applied on a case-by-case basis. It contemplates a consideration of whether transferring venue would promote the efficient administration of the bankruptcy estate, judicial economy, timeliness, and fairness . . . .

*In re Manville Forest Products Corp.* 896 F.2d 1384, 1391 (2d Cir.1990).

When considering the second basis—the convenience of the parties—courts usually have articulated the six general factors set out in *CORCO* as follows:

(1) The proximity of creditors of every kind to the Court; (2) The proximity of the bankrupt (debtor) to the Court; (3) The proximity of the witnesses necessary to the administration of the estate; (4) The location of the assets; (5) The economic administration of the estate; (6) The necessity for ancillary administration if bankruptcy [liquidation] should result.

*CORCO,* 596 F.2d at 1247; *accord In re Boca Raton Sanctuary Associates,* 105 B.R. 273, 274 (Bankr.E.D.Pa.1989); *Oklahoma City,* 98 B.R. at 199.

## A. The Debtors' Principal Place of Business

 Determination of a debtor's principal place of business requires a fact intensive inquiry. There are two schools of thought with respect to the question. The first, sometimes called the "nerve cen-

ter test" focuses on the where the debtor's most important or consequential business decisions are made. *In re Peachtree Lane Associates, Ltd.,* 206 B.R. 913, 920–22 (N.D.Ill.1997); *In re Midland Associates,* 121 B.R. at 460–61 n. 1. This has been held to be so even where the physical location of the Debtor's assets is elsewhere. *In re Landmark Capital Co.,* 19 B.R. 342, 347 (Bankr.S.D.N.Y.1982) ("[T]he place where the debtor makes its major business decisions constitutes the principal place of business of a debtor, notwithstanding the physical location of its assets or production facilities"). A second line of authority (sometimes called the "operational test") focuses on where the debtor's day to day operations take place. *In re EDP Medical Computer Systems Inc.,* 178 B.R. 57, 62 (M.D.Pa.1995); *In re Condor Exploration, LLC,* 294 B.R. at 374.

The Movants maintain that the present Debtors can satisfy neither test. The Debtors, for their part, concede that the hotels in question operate in New York, but maintain that they satisfy the *nerve center test* which, they stress, is the generally applied and accepted test in this district. *Oklahoma City Associates,* 98 B.R. at 198 (and cases cited therein).

The *nerve center test* appears to represent the majority view, and the Court concludes, upon the evidence before it, that the Debtors have established that offices located at 251 W. DeKalb Pike, King of Prussia, Pennsylvania are their principal place of business. On this score, the Court observes that the very transactional documents upon which the movants rely expressly recite that the principal office of each Debtor is located at the foregoing address. (*See, e.g.,* Exhibit J–3, J–4, & J–5, and Exhibit J–8, J–9 & J–10). Indeed, certain notices sent to each Debtor by Sun Trust relative to defaults in the repayment of bond debt (Exhibit D–4 and D–5) were sent to the Debtors in King of Prussia, Pennsylvania, but were apparently not sent at all to the hotel facilities themselves. (Transcript (T) at 65) The Movants place little weight on this seeming inconsistency in their position. They point instead to the fact that on site general managers at each facility make most of the day to day operational decisions, and that on site accounting personnel create and maintain many, if not most, of the hard copy source documents which reflect the hotel's operations, as well as the original accounting records produced therefrom. The Movants also stress that Gary Isenberg, who is the director of hotel operations for the two hotels, visits the facilities on a regular basis each week. While noteworthy, these facts are not dispositive.

The evidence also demonstrated that the present hotels are two of six owned and operated by Martin Field, the owner of the corporate general partner of the limited partnerships that own each hotel. A corporation known as New Penn Management Co., Inc. oversees the operations of the hotel group, and maintains its offices at the King of Prussia location. The evidence offered established that Mr. Field, Mr. Isenberg, Helen Avgerninos, (identified as the corporate controller), and Christopher Polityka (identified as the corporate director of human resources), all maintain their principal office in King of Prussia. Finally, the evidence offered further established: 1) that computer access to the books and records of each hotel exists at the King of Prussia headquarters; 2) that managerial oversight of the hotels' revenues and expenditures emanates from King of Prussia; 3) that important records such as tax returns, insurance policies and other contracts are reposed in King of Prussia; 4) that sales, marketing and capital expense decisions are made in King of Prussia; and 5) that interaction between the Debtors and their principal creditors—

the bondholders, has always gone through King of Prussia. On the strength of this record, the Court is satisfied that King of Prussia is the "nerve center" of the Debtors and that venue for the cases is thus properly laid here.

Having reached this conclusion, the Court need not, and therefore does not, reach the question of whether venue in the present two cases would also lie under 28 U.S.C. § 1408(2), by virtue of the Debtors' contention that an "affiliate," i.e. Prussia Associates L.P. (which owns and operates the Valley Forge Hilton Hotel) is a debtor in a bankruptcy case pending in this district at docket number 04–11402

Having concluded that venue is proper in this district, the Court turns next to the question of whether the case should nevertheless be transferred to the Eastern District of New York.

### B. Transfer Based on the Interest of Justice or Convenience of the Parties.

 Some courts have combined the interest of justice analysis with the convenience of the parties analysis. *See e.g.,* *Matter of Continental Airlines Inc.,* 133 B.R. 585, 587–88 (Bankr.D.Del.1991), *In re Thomson McKinnon Securities Inc.,* 126 B.R. 833, 835–36 (Bankr.S.D.N.Y.1991), which is perhaps understandable, since the facts and circumstances which inform one evaluation will almost always bear on the

other as well. Clearly, that is the case here. The issues overlap to the point that analyzing them separately under the disjunctive tests set forth in 28 U.S.C. § 1412 would result in considerable repetition. Rather than belabor its points in that fashion, the Court will simply articulate the reasons why, in its view, the Movants have failed to meet their burden of proof under either variant.

The Court begins by acknowledging what is easily the Movant's best argument. A clear majority of those courts which have confronted the question have concluded that cases involving real estate should be heard where the real estate is located. The rationale which underpins these decisions generally speaks to the 6 objective factors discussed above and/or stresses the importance of local concerns about the administration of a bankruptcy case involving local, improved real estate.[1]

This factor, however, is by no means a litmus test, for if it were it would essentially eviscerate meaningful evaluation of the question.

The Debtors observe, correctly, that the clear majority of cases in which venue has been transferred based upon the location of realty assets involved situations in which the venue selected by the debtor was quite geographically remote from the situs of the real estate.[2] The location factor, in the opinion of this Court, takes on

---

1. *In re Midland Associates,* 121 B.R. at 461 citing *In re Sovereign Group 1985–1, Ltd.,* No. 10934F (E.D.Pa. May 31, 1990); *Oklahoma City Associates,* 98 B.R. at 199 (Bankr.E.D.Pa. 1989); *Pavilion Place,* 88 B.R. at 36 (Bankr. S.D.N.Y.1988); *In re Sundance Corporation,* 84 B.R. 699, 703 (Bankr.Mont.1988); *In re Nantucket Apartments Associates,* 80 B.R. 154, 156 (Bankr.E.D.Mo.1987); *Matter of Landmark Capital Co.,* 19 B.R. at 347–348.

2. *Condor,* 294 B.R. at 372 (Colorado to Wyoming); *347 B.L.,* 294 B.R. at 334 (Nevada to

Florida); *In re The Sporting Club, L.P.* 132 B.R. 792, 801 (Bankr.N.D.Ga.1991) (Georgia to Illinois and Florida); *In re Midland,* 121 B.R. at 462 (Pennsylvania to Texas); *Oklahoma,* 98 B.R. at 200 (Pennsylvania to Oklahoma); *Pavilion,* 88 B.R. at 32 (Minnesota versus New York); *Nantucket,* 80 B.R. at 157 (Missouri to Louisiana); *Landmark,* 19 B.R. at 349 (New York versus Arizona); *In re Birchminster Corp. of California,* 6 B.R. 258, 263 (Bankr.E.D.Pa.1980) (Pennsylvania to California).

less compelling significance where, as here, the venue choices are between the Eastern District of Pennsylvania and the Eastern District of New York. Indeed, the relative proximity of the two jurisdictions in question, along with certain other factors, causes many typical assumptions made in real estate case venue disputes to break down.

For instance, the argument is made that because the Debtors' hotels are in New York, the witnesses who must be heard from in this case will be greatly inconvenienced if the case remains here. The evidence simply does not bear this out. For example, the largest creditor, by far, is Movant Sun Trust Bank, in its capacity as indenture trustee for the bondholders of each hotel. Sun Trust's aggregate claim of approximately $90,0000,000 dwarfs all others. Clearly, it is fair and appropriate to consider the convenience of this venue to Sun Trust. On this score, however, the record reflects that Sun Trust's corporate headquarters is located in Atlanta, GA, while its communications with the Debtors have been from a Mr. Wallace Duke, Group Vice President of the Corporate Trust Department, whose office is located in Nashville, Tennessee. Similarly, the Movants have retained as accountants, American Express Business and Tax Services. AMAX, as it is known, has staffed this engagement with personnel out of its office in Chicago, IL. Finally, in this vein, the Movants have emphasized to the Court the existence of pre-petition receivership proceedings commenced in New York and the likely importance herein of witnesses acquainted with those cases. Yet, the Court notes, the receiver appointed in the New York proceeding is an entity, "Shaner Management," which is located in State College, Pennsylvania, and that company retained as its representative, a Mr. Shahriari, who resides in Houston, TX. Given the geographic base of the persons identified above, the Court finds unpersuasive the contention that it will work a hardship upon such persons to appear in Court in Philadelphia versus the Eastern District of New York.[3]

The Movants argue, and the Debtor concedes, that the relative proximity of the two potential venues is an argument which can cut both ways; which is to say that if it is not inconvenient for witnesses to appear in Philadelphia versus New York, then it may not be inconvenient for the Debtors' witnesses to appear in New York. The point, however, does not reduce to such a simple tautology. Even if the convenience factor were to be seen as neutral, which for the Debtor it is not, given that King of Prussia lies roughly just 15 miles west of the Philadelphia courthouse,[4] the

3. The Court pauses here to briefly note the somewhat curious circumstance of a possible 20 million dollar second mortgage against the hotel properties held by the late Joseph Selig. Counsel for the estate of Mr. Selig appeared at the hearing on November 10, 2004, and confirmed that he had represented Mr. Selig in the acquisition of this secured interest and that the estate of Mr. Selig favored retention of venue here. The probative weight of this factor was cast into question, however, after the Movants directed the Court's attention to passages in the underlying loan documents which appear to permit Sun Trust to have the subject mortgage marked satisfied of record upon Mr. Selig's death.

4. An oft-cited passage states: "Where a transfer would merely shift the inconvenience from one party to the other, or where after balancing all the factors, the equities leaned but slightly in favor of the movant, the [debtor's] choice of forum should not be disturbed." *In re Garden Manor Assoc., L.P.*, 99 B.R. 551, 555 (Bankr.S.D.N.Y.1988) (citing 1 Moore's Federal Practice ¶ 0.145[5] (2d ed.1988)); *In re Great American Resources, Inc.*, 85 B.R. 444, 446 (Bankr.N.D.Ohio 1988); *In re Enron Corp.*, 274 B.R. at 342–43 (citing foregoing cases).

convenience of witnesses alone is not the only factor to be considered.

The Movants, for example, also stress the importance of the location of the Debtors' unsecured creditors. Clearly, this too is a relevant factor. On this score, and based on the information available at the present time, the Movants calculate that in the LaGuardia case, 55.1% of unsecured creditors are located in New York. The figure for Field Hotel Associates is a slightly higher 61.8%. This means, and the Debtors' creditor matrix confirms, that fully 40 to 50% of the Debtors' unsecured creditors are located elsewhere. The Debtors' non-New York based unsecured creditors are, in fact, spread out all over the nation, and even include some creditors in foreign countries. Significantly, of the Debtors' twenty largest unsecured creditors, the only such creditors to have weighed in with an opinion on the question before the Court are four such creditors in the LaGuardia case and two such creditors in the Field Associates case. These creditors, through counsel, filed responsive pleadings and appeared at the November 10, 2004 hearing *in support* of the Debtors' opposition to a change in venue. The Court finds the Movants' argument, interposed on behalf of the unsecured creditor constituency, to carry much less weight in light of these facts.

The Court notes also the strident support of venue transfer lodged by the New York Hotel and Motel Trades Council—AFL–CIO. It was demonstrated to the Court that the Union had undertaken pre-petition organizing activity at the two Debtor locations, and that the Union had been certified as the bargaining representative for the LaGuardia employees and was awaiting certification as representative of the Fields employees. Importantly, it was stressed to the Court that there were pending at the time of the commencement of these cases proceedings before the National Labor Relations Board, (NLRB) in New York, relating to alleged unfair labor practices on the part of the Debtors. The Union argues that, due to this, the Debtors' employees have a keen interest in the administration of this case, the expression of which will be hindered if the case goes forward here. There is, as with many of the arguments made to the Court on the venue issue, a measure of appeal to the Union's position. However, certain countervailing points warrant mention.

First, it must be remembered that neither the filing of these bankruptcy cases, nor their administration here, will operate to stay proceedings before the NLRB in New York. *See, generally, In the Matter of Penn Terra Limited,* 24 B.R. 427, 431–32 (Bankr.W.D.Pa.1982). The Debtors make no argument to the contrary. Furthermore, the Court notes that among the various "first day" motions presented in these cases, were motions to pay pre-petition payroll and various employee benefits, expenses and obligations. These motions have been approved by the Court, such that there are at this juncture, no outstanding employee wage claims. Given this, given also the fact that the grievance proceedings will go forward with minimal, if any, disruption, and given, finally, the fact that proceedings in this Court are fully electronic with respect to both case filing and case management, the Debtors' employees' concerns with respect to monitoring the cases are to a large extent ameliorated.

Of similar ilk is the position of the NY-CIDA and the New York City Economic Development Corporation (N.Y.CEDC). In a position statement submitted in these proceedings, both the NYCIDA and the NYCEDC expressed support of the Movant's motion. Their brief "Statement"

largely echoes the Movants' arguments concerning proximity and the convenience of witnesses. At the hearing on November 10, 2004, however, counsel for the New York agencies made oral argument which in some respects captured the essence of the present controversy. Counsel for the New York agencies stressed that the Debtors "took advantage" of bonds issued by New York agencies and had "unequivocally chose" to run their business in New York City, knowing that such things as litigation and labor disputes could arise. (T at 99) Counsels' argument, as well as any other, resonated the collective sense of what amounts for the most part to dismay and frustration on the part of the Movants and their supporters that the law could possibly permit the bankruptcy proceedings of these Debtors to go forward anywhere other than in New York. Yet, clearly it does.

The law, as hereinbefore noted, cautions the Court to respect the Debtors' selection of venue provided it is proper, absent cause to disturb it. In the instant case cause to transfer venue has not been shown. To the contrary, there is good cause, supported by evidence of record, to support the Debtors' choice of venue, which, as previously discussed, the Court finds to be proper. The Debtors have emphasized that their management team is here. Principal decision making with respect to the formulation of a reorganization strategy, including the critical negotiations which must inevitably take place between the Debtors and Sun Trust will obviously occur here. The Debtors stress the likelihood that proceedings in New York for a variety of reasons, such as the need for local counsel and lead counsel's

travel expenses, would likely result in greater expense of administration. (T at 88) The Court credits testimony to this effect as almost certainly accurate. There has been no showing that the present venue is "inconvenient" to those persons with a likely need to appear in Court, nor has there been a showing that relevant information concerning the Debtors is not as readily accessible in King of Prussia as is New York. Pending labor disputes, meanwhile, will go forward unabated, in the forum where they lie.[5]

In closing, the Court notes the Movant's heavy reliance on the decision of the Bankruptcy Court in *In the Matter of Macatawa Hospitality Inc.*, 158 B.R. 82 (Bankr. E.D.Mich.1993). In this case, which the Movants describe as having an eerie similarity to the present case, the Bankruptcy Court for the Eastern District of Michigan transferred venue of a resort hotel case to the Western District of Michigan. This decision, however, is distinguishable. In *Macatawa*, the Court observed that although the geographical distance between the forums in question was not great, it burdened the creditors more than the debtor, and was likely in fact to reduce or chill the participation of material creditors in the proceeding. *Id.* at 88. For the reasons hereinbefore discussed, the Court does not find that to be the case here. Moreover, the *Macatawa* case itself involved a single facility. The *Macatawa* Court itself acknowledged the distinction between the case before it, and a situation where there might be a number of plants, facilities, or locations with a central "headquarters" performing a variety of important and crucial management functions in-

---

5. The Court notes that the final *CORCO* factor, i.e., the necessity for ancillary administration if liquidation should result, has not been viewed as of paramount importance in the early stage of a Chapter 11 case, particularly

where there is no evidence that the debtor's intention is to liquidate, nor evidence which would suggest that liquidation will likely result. *See e.g., Enron*, 284 B.R. at 390–91; *Holiday Towers* 18 B.R. at 189.

volving or necessitating the centralization and/or coordination of activities, be they financial, marketing, purchasing, accounting, research, etc., with the consequent economies of scale and aspects of day to day control necessary to a viable and ongoing enterprise. *Id.* at 87. In short, the *Macatawa* Court found no "nerve center" present. The instant Debtors, in contrast, and as discussed above, satisfy the nerve center test, thus supporting a result contrary to that reached in *Macatawa.*

For all of the above reasons, the Motion to transfer venue of these bankruptcy cases will be denied.

An appropriate Order follows.

### ORDER

AND Now, upon consideration of the *Motion of Suntrust Bank, as Successor Indenture Trustee and Brickman Airport Receivable Holdings LLC to Transfer Venue of Cases to Eastern District of New York,* all pleadings filed in support of and in opposition to the Motion, and after combined evidentiary hearing held November 10, 2004, it is hereby:

ORDERED, that for the reasons set forth in the within Opinion, the Motion to Transfer Cases shall be and hereby is Denied.